300 F.2d 247
 62-1 USTC P 9338
 ARCADIA SAVINGS AND LOAN ASSOCIATION (a dissolved California
corporation, by and through its duly qualified officers and
directors), Arthur F. Picco and Charles J. Picco, Trustees
under the Will of Lena Picco, Deceased, Gould L. Eddy and
Lucia P. Eddy, Husband and Wife, George E. Osborn, Harold G.
Petz, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 17347.
 United States Court of Appeals Ninth Circuit.
 March 13, 1962.
 
 Forster & Gemmill, Richard H. Forster, James H. Knecht, Jr., Los Angeles, Cal., for petitioner.
 Louis F. Oberdorfer, Asst. Atty., Gen., Lee A. Jackson, Harry Baum, Fred E. Youngman and Morton Rothschild, Attys., Dept. of Justice, Washington, D.C., for respondent.
 Before JERTBERG and DUNIWAY, Circuit Judges, and DAVIS, District judge.
 JERTBERG, Circuit Judge.
 
 
 1
 The Tax Court of the United States rendered its decision redetermining deficiencies in income tax against petitioner Arcadia Savings and Loan Association (hereinafter referred to as 'Arcadia') for the years 1954 and 1955 in the respective amounts of $8,385.57 and $111,327.62, and its decisions fixing the amounts of the liabilities of the remaining individual petitioners as transferees of Arcadia, the parties having stipulated that the transferees were liable as such for any unpaid taxes due and owing by Arcadia.
 
 
 2
 A joint petition for review of the decisions of the Tax Court was timely filed. The opinion of the Tax Court is reported at 34 T.C. 679. This Court has jurisdiction under Title 26 U.S.C. 7482.
 
 
 3
 The basic question for decision is whether amounts deducted from gross income by Arcadia in 1952 and added to bad debts reserve and Federal Insurance reserve, pursuant to Sec. 23 of the Internal Revenue Code of 1939, as amended, 26 U.S.C. 23, for the purpose of computing taxable net income for that year, should be returned to income in 1954 and 1955 following Arcadia's sale of its loans receivable and other assets as of January 2, 1953.
 
 
 4
 The case was presented to the Tax Court on a stipulation of facts supplemented by documentary exhibits. The salient facts extracted from the stipulation are:
 
 
 5
 Arcadia was organized in 1927 as a guarantee stock association pursuant to the laws of the State of California, issuing 250 shares of guarantee stock, and thereafter carried on a savings and loan business, in the usual and customary manner, until its dissolution on December 30, 1955. At all times Arcadia was a member of the Federal Home Loan Bank and Federal Savings and Loan Insurance Corporation.
 
 
 6
 Arcadia, as a savings and loan association, was exempt from Federal income tax under Sec. 101(4) of the Internal Revenue Code of 1939, 26 U.S.C. 101(4) until that section was modified by Sec. 313(e) of the Revenue Act of 1951, c. 521, 65 Stat. 452, removing such exemption as of December 31, 1951. Arcadia had accumulated, during the years it was exempt from income tax, reserves in the amount of $167,500.00. The net income of Arcadia for the taxable year 1952 was $259,931.32. Arcadia was entitled, under Sec. 23(k)(1) of the Internal Revenue Code of 1939, as amended, to deduct from its gross income for 1952 as a reserve for bad debts, the amount equal to the lesser of its net income for that year ($259,931.32), or the amount ($275,885.63) by which 12 per centum of its total deposits or withdrawable accounts at the close of such year exceeded the sum of its surplus, undivided profits, and reserves as of January 1, 1952, the beginning of its taxable year. Accordingly, Arcadia credited.$18,805.00 of its net income for 1952 to its loan reserve and Federal Insurance reserve account, and credited the balance of its net income for 1952, or $241,126.32, to its reserve for bad debts account and reported no taxable income for the taxable year ended December 31, 1952.
 
 
 7
 At the end of 1952, Arcadia's total reserves amounted to $427,431.32 consisting of said sums of $167,500.00 and $259,931.32. Arcadia made no further additions to its reserves for bad debts. Subsequent to 1952, the reserve accounts were shown for accounting purposes at all times as capital accounts on Arcadia's books, and in the capital or net worth section of Arcadia's balance sheets in the manner uniformly required by various California and Federal agencies.
 
 
 8
 On or about December 12, 1952, Arcadia entered into an agreement with Home Savings and Loan Association (hereinafter referred to as 'Home') to become effective on January 2, 1953, pursuant to which Arcadia sold and transferred substantially all of its real estate loans together with its place of business, furniture and other assets to Home.
 
 
 9
 Arcadia duly elected to wind up and dissolve on September 22, 1954 and completed its winding up and dissolution and December 30, 1955. As of December 31, 1954, Arcadia had real estate loans outstanding in the amount of $243,805.22 and no portion of the $259,931.32 which had been added to Arcadia's reserves in 1952 was returned to income for the taxable year 1954. As of December 31, 1955, Arcadia had no real estate loans outstanding, and no portion of the $259,931.32 which had been added to Arcadia's reserves in 1952 was returned to income for the taxable year 1955. Arcadia's remaining assets, after the sale to Home, were distributed during 1954 and 1955 to the owners of its guarantee stock, for of from are the individual petitioners in this review. The individual petitioners have acknowledged their transferee liability in the event that the deficiencies asserted against Arcadia are upeld.
 
 
 10
 The Tax Court determined that the post-1952 reserve accumulation of $259,931.32 should be restored to income and that there should be included in Arcadia's income for 1954 the sum of $16,126.10, being the difference between the 1952 addition to reserve of $259,931.32 and the real estate loans of $243,805.22 outstanding at the end of 1954; and that the balance of $243,805.22 should be added to income for 1955, at the end of which year there were no real estate loans outstanding. It was stipulated that the pre-1952 reserves of $167,500.00 should not be treated as taxable for either year.
 
 
 11
 Section 23(k)(1) of the Internal Revenue Code and its successor sections in the 1954 Internal Revenue Code, contain the basic provisions which permit taxpayers to charge off bad debts or to make reasonable additions to bad debt reserves. Section 23(k)(1) was amended by the 1951 Revenue Act to include mutual savings banks not having capital stock, domestic building and loan associations, and cooperative banks not having capital stock. Section 23 of the Internal Revenue Code of 1939, as amended, in relevant part provides:
 
 
 12
 'SEC. 23. Deductions from gross income.
 
 
 13
 'In computing net income there shall be allowed as deductions:
 
 
 14
 '(k) Bad Debts.--
 
 
 15
 '(1) General rule.-- (as amended by Section 124(a) of the Revenue Act of 1942, c. 619, 56 S.Ct. 798, Section 113(a) of the Revenue Act of 1943, c. 63, 58 Stat. 21, and Section 313(e) of the Revenue Act of 1951, c. 521, 65 Stat. 452). Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. In the case of a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and co-operative bank without capital stock organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of (A) the amount of its net income for the taxable year, computed without regard to this subsection, or (B) the amount by which 12 per centum of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year. * * *'
 
 
 16
 '(26 U.S.C. 1952 ed., Sec. 23.)'
 
 
 17
 The Tax Court's decision in this case was based upon the well established principle that additions to a reserve for bad debts previously deducted in computing taxable income must be included in taxable income when and to the extent that the reserve is no longer necessary. Petitioners do not quarrel with this principle but, on the contrary, 'fully recognize that a substantial body of case law has developed with respect to the tax treatment of bad debt reserves of ordinary businesses or commercial banks when the need for such reserves has ended. For example, when the accounts receivable of a business are sold and there is a credit balance in the reserve for bad debts, such amount is returned to income in the year of the sale for the reason that the reserve is no longer needed. Geyer, Cornell & Newell, 6 T.C. 96 (1946), Acq. 1946-1 C.B. 2. Also see Rev.Rul. 57-482, 1957-2 C.B. 49. Similarly, when a taxpayer changes from the reserve method of bad debt accounting to the direct charge-off method, the credit balance in the reserve account is returned to income in the year of the change. Rossin & Sons, Inc., 40 B.T.A. 1275 (1939), rev'd 113 F.2d 652, 40-2 U.S.T.C.Par. 9594 (C.A.2d, 1940). These principles have recently been reaffirmed by this court in West Seattle National Bank of Seattle, 33 T.C. 341 (1959), aff'd, 288 F.2d 47 (1961).' However, petitioners insist 'that the use of the term 'reserve for bad debts' in Sec. 23(k)(1), as that term is applied to savings and loan associations, is inconsistent with accepted accounting principles, and that this inconsistency is further apparent from the legislative history of the 1951 Act.' Petitioners argue that a proper interpretation of Sec. 23(k)(1), in the light of the legislative history, compels the conclusion that Congress intended that savings and loan associations should not be subject to tax at all until their reserves reach the ceiling provided in the 1951 Act.
 
 
 18
 Petitioners argue that Arcadia's bad debt reserve was not a bad debt reserve under accepted principles of accounting; that the addition to a bad debt reserve must reflect the losses from business bad debts which have been experienced during preceding income periods and that such additions to a bad debt reserve have, therefore, a direct relationship to business history and must be reasonable as determined from the taxpayer's actual experience. In distinguishing Arcadia's reserve for bad debts from an ordinary bad debt reserve, petitioners state that the additions to bed debt reserves permitted by Sec. 23(k)(1) to savings and loan associations has no relationship to the loans receivable, or to any other asset account of the association, and may be made to the full extent permitted without regard to the institution's history of lona losses.
 
 
 19
 While there may be some inconsistency in the use of the term 'reserve for bad debts' as applied to savings and loan associations, we regard such inconsistency to be without significance in the context of this case. To us, the significant facts are that Arcadia received a tax benefit when its 1952 net income escaped taxation upon being added to its reserves for bad debts and that the need for such reserves ceased following the sale of its business and real estate loans. See West Seattle National Bank of Seattle v. Commissioner of Internal Revenue, 288 F.2d 47 (9th Cir., 1961).
 
 
 20
 The 1951 Amendment was added to the deduction provisions of the 1939 Code and specifically under the sub-title labeled 'Bad Debts.' The statutory provision of the 1951 Amendment relating to savings and loan associations furnishes a formula for measuring a reasonable addition to a reserve for bad debts but it does not change the concept of a reasonable addition to a reserve allowable as a deduction for bad debts nor the nature of the deduction. The fact that the formula permits the creation of unusually large reserves for bad debts 'is not incompatible with the bad debt function of the reserves.' Citizens Federal Savings and Loan Association of Cleveland v. United States, 290 F.2d 932, at p. 935, Court of Claims (1961). The reserve here in issue was created by deduction from gross income in 1952 and credited to the reserve for bad debts under the 1951 Amendment as a result of which Arcadia's net income for 1952 escaped taxation.
 
 
 21
 The language of Sec. 23(k)(1) is plain and unambiguous. Such language permits additions to a reserve for bad debts. It does not create a partial tax exemption. The plain meaning of the language used does not produce absurd or unreasonable results. Under such circumstances, we see no justification for resort to legislative history. We have, however, examined such history and to us it indicates only a concern on the part of Congress that previously tax exempt institutions be afforded an opportunity to accumulate generous reserves against possible losses and not that the amounts added to such reserves should be exampt from tax rather than allowed as deductions.
 
 
 22
 The Tax Court properly held that since the reserves in issue had been previously deducted in computing taxable income, such reserves must be included in taxable income when and to the extent that the need for the reserves ceased.
 
 
 23
 Petitioners suggest that under Section 23(r), dividends paid to depositors are deductible from Arcadia's income, and that, when construed with Section 23(k) (1), this indicates an intention of th Congress that all income of savings and loan associations should be taxed but once, in the hands of the depositors or shareholders. There is no merit in that argument. The moneys here involved were not paid to depositors, either as dividends or at all (23(r)), but to the guarantee stockholders. We find nothing in the Act indicating that payments to such stockholders are deductible from Arcadia's income for tax purposes.
 
 
 24
 The orders and decrees of the Tax Court are affirmed.