GEORGIA FEDERAL BANK, F.S.B. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26870-90.          Filed February 4, 1992.

*Robert M. Fink* and *Roger S. Reigner, Jr.,* for petitioner.
*Bonnie L. Cameron,* for respondent.

## OPINION

WELLS, *Judge:* The instant case is before us on petitioner's motion for summary judgment. Respondent determined a deficiency of $114,193 in petitioner's Federal income tax for its taxable year ended April 11, 1986. At the time the petition in the instant case was filed, petitioner's principal place of business was located in Atlanta, Georgia. From 1970 through 1982, petitioner computed its deduction for the addition to its bad debt reserves using the percentage of taxable income method set forth in section 593(b)(2)(A).[1] From 1980 through 1984, petitioner sustained net operating losses (NOL's) within the meaning of section 172(c), which NOL's may be carried back under section 172(b)(1)(F) to each of the 10 taxable years preceding the loss years.

The parties agree that the sole issue presented is the validity of subdivisions (vi) and (vii) of section 1.593-6A(b)(5), Income Tax Regs., under which respondent seeks to calculate petitioner's tax liability for its taxable year ending April 11, 1986. The challenged provisions generally provide that taxable income is to be reduced by any NOL carrybacks before the deduction for addition to bad debt reserve is calculated. Sec. 1.593-6A(b)(5)(vii), Income Tax Regs. Such regulations were adopted May 17, 1978 (the 1978 regulations). T.D. 7549, 1978-1 C.B. 185. Taking NOL carrybacks into account in such manner reduces the base of taxable income on which the bad debt reserve addition is calculated, and so reduces the deduc-

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

tion below the amount originally calculated in the taxable year to which the NOL carryback is applied.

The 1978 regulations changed the method by which a mutual institution's bad debt reserve addition is calculated in a year to which an NOL carryback is applied. The first regulations interpreting section 593 provided that taxable income is to be computed "without regard to any section providing for a deduction the amount of which is dependent upon the amount of taxable income". Sec. 1.593-1(b)(1), Income Tax Regs., T.D. 6188, 1956-2 C.B. 310, 321 (the 1956 regulations). The 1956 regulations were cited in Rev. Rul. 58-10, 1958-1 C.B. 246, which provided that, for purposes of calculating the bad debt reserve addition, taxable income was not to be reduced by NOL carrybacks. The 1958 revenue ruling was incorporated in changes to the regulations adopted in 1964. Sec. 1.593-6(b)(2)(iv), Income Tax Regs., T.D. 6728, 1964-1 C.B. 195, 202 (the 1964 regulations). Thus, the 1978 regulations challenged by petitioner reversed an ordering rule that had been in effect for approximately 20 years.

The issue of which of the two opposing interpretations should be sustained was decided by this Court in *Pacific First Federal Savings v. Commissioner,* 94 T.C. 101 (1990), on appeal (9th Cir., Feb. 8, 1991). We held, based on our review of the structure of section 593(b) and its legislative history, that the 1978 regulations were invalid because they did not harmonize with congressional intent. Recently, the Sixth Circuit disagreed with our conclusion and upheld the 1978 regulations. *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d 289 (6th Cir. 1991), revg. T.C. Memo. 1990-129. In our Memorandum Opinion in *Peoples Federal,* we granted summary judgment on the basis of our opinion in *Pacific First Federal.* The Sixth Circuit reversed. After due consideration and with due respect to the Sixth Circuit, we conclude that our holding in *Pacific First Federal* was correct, and we therefore will follow it in cases not appealable to the Sixth Circuit. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

In *Peoples Federal,* the Sixth Circuit held that we failed to give proper deference to the 1978 regulations under the principles set forth in *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837 (1984). We therefore will begin our

analysis in the instant case by discussing those principles. In *Chevron,* the Supreme Court reviewed the standards courts must employ in deciding the reasonableness of an agency's interpretation of statutory law. First the court must decide whether Congress had an intention on the question in issue. *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 842-843. Such a question is a matter of statutory construction, on which the judiciary is the final authority. *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 843 n.9.

If a court, using the traditional tools of statutory construction, such as the plain language, structure, and legislative history of the law, ascertains that Congress has addressed the precise question at issue, that is the end of the matter. *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 842-843. Thus, "If Congress has spoken to the issue with which we are concerned, there is no need for deference" to an agency's construction of the law. *U.S. Mosaic Tile Co. v. NLRB,* 935 F.2d 1249, 1255 (11th Cir. 1991).

If, on the other hand, the court concludes that the statute is silent or ambiguous with respect to the specific issue, the question for the court is "whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 843. The principle of deference embodied in such standard of review, however, "only sets 'the framework for judicial analysis; it does not displace it.'" *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982) (quoting *United States v. Cartwright,* 411 U.S. 546, 550 (1973)). "[T]he essential function of judicial review, in this context, is to ensure that the agency engaged in 'reasoned decisionmaking'." *United States v. Garner,* 767 F.2d 104, 116 (5th Cir. 1985). The courts—

[have] firmly rejected the suggestion that a regulation is to be sustained simply because it is not "technically inconsistent" with the statutory language, when that regulation is fundamentally at odds with the manifest congressional design. [*United States v. Vogel Fertilizer,* 455 U.S. at 26.]

A reviewing court should consider the agency's reaction to objections raised by the public and how the agency rebutted vital relevant comments during the regulatory process. *Lloyd Noland Hospital & Clinic v. Heckler,* 762 F.2d 1561, 1566-1567 (11th Cir. 1985) (citing *Western Coal Traffic League v. United States,* 677 F.2d 915, 927 (D.C. Cir. 1982)). To guard against

arbitrary action, a court must engage in a "'thorough, probing, in-depth review' of the agency's asserted basis for [its] decision, ensuring that 'the agency [has] * * * examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action'". *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C. Cir. 1988) (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43 (1983), and *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971)).

Many factors have been applied to aid in the decision as to whether the agency's interpretation is a reasonable construction of the statute. A regulation which is a substantially contemporaneous construction of the statute is entitled to special weight, as its drafters are presumed to have a greater awareness of congressional intent, and such construction is therefore more likely to reflect such intent. *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981); *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979). Where a contemporaneous construction remains consistent over a long period of time, it is entitled to special deference. *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n.17 (1981).

If a regulation dates from a period after the enactment of the statute which it interprets, or repudiates an earlier interpretation, the manner in which it evolved merits inquiry. *National Muffler Dealers Association v. United States,* 440 U.S. at 477; *State of Washington v. Commissioner,* 77 T.C. 656, 671 n.12 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982). Additional considerations include the length of time it has been in effect, the consistency of the agency's interpretation, and the degree of scrutiny which Congress has devoted to the regulation during subsequent reenactments of the statute. *NLRB v. Food & Commercial Workers Local 23,* 484 U.S. 112, 124 n.20 (1987); *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979).

An agency has the flexibility to modify its regulations in the light of experience and to respond to changed circumstances. *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 863-864. If an agency reverses a prior statutory interpretation, however, its most recent expression may be accorded less deference than a consistently maintained position. *INS v.*

*Cardoza-Fonseca,* 480 U.S. 421, 446 n.30 (1987); *Watt v. Alaska,* 451 U.S. 259, 273 (1981); *Seldovia Native Association, Inc. v. Lujan,* 904 F.2d 1335, 1345 (9th Cir. 1990). "Sharp changes of agency course constitute 'danger signals' to which a reviewing court must be alert." *West v. Bowen,* 879 F.2d 1122, 1127 (3d Cir. 1989) (quoting *Natural Resources Defense Council v. EPA,* 683 F.2d 752, 760 (3d Cir. 1982)).

An agency which changes its position must acknowledge that its interpretation has shifted, and must supply a persuasively reasoned explanation for the change. *Motor Vehicle Manufacturers Association v. State Farm Mutual Ins. Co.,* 463 U.S. at 48; *Vargas v. INS,* 938 F.2d 358, 360 (2d Cir. 1991) (agency changing course must supply "sound reasons for the change"); *GMC v. National Highway Traffic Safety Admin.,* 898 F.2d 165, 175 (D.C. Cir. 1990); *Acadian Gas Pipeline System v. FERC,* 878 F.2d 865, 870 (5th Cir. 1989); *Lloyd Noland Hospital & Clinic v. Heckler,* 762 F.2d 1561, 1567 (11th Cir. 1985). "[T]he thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's [interpretation]". *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37 (1981).

Furthermore, "an agency's action must be upheld, if at all, on the basis articulated by the agency * * * [at the time of the rule making]." *Motor Vehicle Manufacturers Association v. State Farm Mutual Ins. Co.,* 463 U.S. at 50; *Chemical Manufacturers Association v. EPA,* 899 F.2d 344, 359 (5th Cir. 1990). "The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Manufacturers Association v. State Farm Mutual Ins. Co.,* 463 U.S. at 43. Thus, post hoc rationalizations cannot be offered to buttress an agency's action, as they are unreliable indicators of the actual basis for an agency's course of action.

Turning to the instant case, as the foregoing authorities demonstrate, *Chevron's* rule of deference only applies if Treasury's new interpretation is not contrary to the clear intent of Congress. *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. at 843-845. In *Pacific First Federal,* our review of the legislative history disclosed that Congress intended that mutual institutions' reserves be curtailed only to a point, and not beyond. The Sixth Circuit did not disagree

with that interpretation. Rather, it characterized our analysis as a variant of the reenactment doctrine and stated that our reliance on that doctrine was misplaced, even though we specifically stated, as noted by the Sixth Circuit, that we did not rely on the reenactment doctrine.

In *Pacific First Federal,* after analyzing the legislative history, we concluded that the legislative history revealed that Congress reached a compromise on the effective tax rate for mutual institutions. We also concluded that the new ordering rule contained in the 1978 regulations increased the effective tax rate beyond the level Congress intended by contracting the taxable income base to which the applicable percentage is applied in computing the deduction under section 593(a)(2). Moreover, we concluded that the new ordering rule reduced the value of NOL carrybacks contrary to Congress' *expressed* intent of granting a "more generous net operating loss carryback" and that *any* modification of the taxable income base would upset the legislative compromise in 1969. *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 110-114.

We remain convinced that the 1978 regulations contravene Congress' intent. Although *Chevron* was not cited to us in *Pacific First Federal, Peoples Federal,* or the instant case, the application of *Chevron's* rule of deference by the Sixth Circuit in *Peoples Federal* suggests that we should consider it in the context of the instant case.

In *Peoples Federal,* the Sixth Circuit noted several reasons advanced by Treasury when it changed its course in 1978, citing an internal memorandum[2] prepared for senior officials of Treasury in 1978 (the 1978 memorandum). The Sixth Circuit held that the reasons set forth in the 1978 memorandum were "conclusive evidence that the Commissioner's change was a deliberate one," i.e., not arbitrary. *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d at 303. According to the 1978 memorandum, in substance, Treasury concluded that the 1964 regulations were "patently wrong" and that adoption of a contrary position was

---

[2]Attachment to Memorandum to Secretary Blumenthal from Acting Asst. Secretary (Tax Policy) Lubick, Joint Exh. 130-DZ in *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. 101 (1990). Although the 1978 memorandum was a part of the record in *Pacific First Federal,* we did not find the statements in the memorandum to be persuasive. We did not feel the need to consider the reasons for the change once we found that the 1978 regulations contravened Congress' intent.

in order. We respectfully disagree, however, with the Sixth Circuit's holding that the reasons offered in the 1978 memorandum are conclusive of Treasury's lack of arbitrariness.

Before turning to our disagreement with the specific reasons set forth in the 1978 memorandum, the stage should be set with a discussion of the reason Treasury initially advanced for the change made by the 1978 regulations. Treasury's original[3] view was that, by amending section 593(b)(2)(E)[4] in 1969, Congress intended to create an exclusive list of modifications to the taxable income of savings banks for purposes of the bad debt deduction. An examination of the manner in which such provision came to form part of the Code, however, shows that Congress could not have had the intent ascribed to it by Treasury and that the congressional action cannot possibly bear the weight of inference which Treasury placed upon it. The 1969 amendments to section 593(b)(2)(E) consisted of technical amendments proposed by Treasury to remove from the taxable income base, upon which the bad debt reserve addition was calculated, certain types of income which did not give rise to bad debt losses. H. Rept. 91-413, 1969-3 C.B. 200, 279. The proposed technical amendments were accepted with little discussion by Congress, and the legislative history contains no reference to the rule governing NOL carrybacks. As the 1978 memorandum states "there is no evidence Congress considered the matter". Moreover, the technical amendments generated little controversy when they were proposed, while the history of the 1951, 1962, and 1969 legislation shows that every other effort to significantly reduce the percentage method of calculating the bad debt reserve addition had been attended by substantial controversy, indicating that, at the time of the 1969 Act, no one considered that the technical amendments would have the effect of reversing the established rule regarding NOL carrybacks. Indeed, the 1978 memorandum admits as much, stating that "if the industry had known that we [Treasury] would consider changing the regulations, it would probably have raised the issue with Congress."

---

[3] Treasury's original justification for the change was set forth in a Technical Memorandum attached to Transmittal Memorandum from Acting Commissioner Swartz to Assistant Secretary Cohen, July 7, 1971, Exh. 24-X in *Pacific First Federal.*

[4] The Tax Reform Act of 1986 redesignated such subparagraph as sec. 593(b)(2)(D). Pub. L. 99-514, sec. 901(b)(2)(B), 100 Stat. 2085, 2378.

In summary, the 1969 amendments to section 593(b)(2)(E) represented a limited modification to the definition of taxable income and did not represent the result of a comprehensive congressional study of the taxable income base, which would be necessary if we were to accept Treasury's reasoning. The 1969 amendments constituted nothing more than a narrowly focused and technical modification to the percentage method which was not expected to have anything more than a minor impact on the size of the bad debt deduction. Staff of Joint Comm. on Taxation, Summary of Testimony on Mutual Savings Institutions, 91st Cong., 2d Sess. 1-2 (J. Comm. Print 1969). The negative inference which Treasury drew from the 1969 amendments was clearly an insufficient basis for Treasury's change in course. Moreover, we note that, in 1962, Congress had added a limitation to the definition of taxable income in section 593(b)(2)(E) similar to the 1969 changes, but Treasury did not infer from that action that the list of modifications in section 593 was exclusive or that Congress disapproved of the 1956 regulations or Rev. Rul. 58-10. Rather, in the 1964 regulations, Treasury explicitly adopted the ordering rule originally permitted under such authorities. Accordingly, we would have difficulty in accepting Treasury's view that a similar action by a subsequent Congress prevents the continued application of such rule.

We considered such "exclusive list" justification in *Pacific First Federal Savings v. Commissioner,* 94 T.C. at 113-114, but did not find it persuasive. Moreover, we noted that the Commissioner appeared to abandon such argument, indicating a lack of confidence in its merit. *Id.* at 114. Furthermore, the Sixth Circuit did not expressly refute our refusal to accept such justification for the change contained in the 1978 regulations, and we therefore do not accord any weight to such justification.

Turning to a consideration of the justifications mentioned in the 1978 memorandum, the first justification noted by the Sixth Circuit was the statement that the change was being made in order to compute taxable income for purposes of section 593(b) as it "ordinarily" is under the Code. Although such statement implies that Treasury was attempting to achieve consistency in the definition of taxable income, in the

1956 and 1964 regulations, Treasury did not find it essential that the definition of taxable income for purposes of section 593(b) be the same as elsewhere in the Code. Moreover, Treasury did not explain how such consistency would better effectuate the congressional purpose underlying section 593(b). Furthermore, respondent does not uniformly adhere to the definition of taxable income inherent in the 1978 regulations, but in some cases instead has adopted an ordering rule contrary to that adopted in the 1978 regulations. For instance, in Rev. Rul. 60-164, 1960-1 C.B. 254, the Commissioner ruled that in computing percentage depletion under section 613(a), an NOL is not to be taken into account in determining a taxpayer's taxable income from the property.

We also note that, by requiring the elimination or reduction of bad debt reserve additions which were reasonable in the year they were originally calculated, the 1978 regulations contravene the well-established principle that additions to bad debt reserves are not to be altered on account of events occurring after the year the reserve is calculated. *Westchester Development Co. v. Commissioner,* 63 T.C. 198, 212 (1974); *Rio Grande Building & Loan Association v. Commissioner,* 36 T.C. 657, 664 (1961); *C.P. Ford & Co. v. Commissioner,* 28 B.T.A. 156, 159 (1933); sec. 1.166-4(b), Income Tax Regs.

Courts have recognized that section 593 simply provides a method for calculating an addition to bad debt reserves, a deduction for which was provided by section 166(c). *Arcadia Savings & Loan Association v. Commissioner,* 300 F.2d 247, 251 (9th Cir. 1962), affg. 34 T.C. 679 (1960) (section 593 furnishes a formula for the reserve addition but does not change the nature of the deduction); *Rio Grande Building & Loan Association v. Commissioner,* 36 T.C. at 662. The position taken in the 1956 and 1964 regulations, as well as in Rev. Ruls. 58-10, 1958-1 C.B. 246, and 74-188, 1974-1 C.B. 147, was consistent with the well-settled principles governing additions to bad debt reserves. The 1978 regulations, therefore, are contrary to judicial precedents and respondent's own rulings and their adoption created a greater inconsistency than they resolved.

The next justification noted by the Sixth Circuit was the statement in the 1978 memorandum that "the percentage of

taxable income method is in substance a technique to lower the tax rate on thrift institutions." We are constrained to point out, however, that Congress has expressly permitted mutual institutions to use such method in figuring their deductions. Sec. 593(b)(2). Treasury cannot contravene Congress' will by imposing excessive restrictions on the method or impeding the ability of mutual institutions to make use of it simply because Treasury perceives it to be a tax reduction "technique." If respondent believes that the method is improper, he should apply to Congress for a change in the law, rather than seek to change tax policy by means of administrative fiat.

The legislative history of section 593 reveals that Treasury had repeatedly sought to persuade Congress to deny mutual institutions the right to use the percentage of income method. In 1951, when Congress first subjected mutual institutions to the Federal income tax, Treasury proposed that the deduction for bad debt reserve addition be calculated in the manner prescribed for commercial banks.[5] Congress, however, decided to permit a deduction based on the taxable income of the mutual institution so as to permit maintenance of reserves sufficient to absorb losses experienced during downturns in the economy. 97 Cong. Rec. 11842 (1951) (statement of Sen. Lehman), 11843 (statement of Sen. Dirksen), 11888 (statement of Sen. Butler), 11890 (statement of Sen. Capehart).

In connection with congressional consideration of the 1962 tax legislation, Treasury proposed abolition of the percentage method, arguing that it improperly allowed mutual institutions to build up reserves tax-free. Taxation of Mutual Savings Banks and Savings and Loan Associations: Hearings on Treasury Department Report on Taxation of Mutual Savings Bank and Savings and Loan Associations Before the House Committee on Ways and Means, 87th Cong., 1st Sess. 11-14 (1961). Congress, however, declined to adopt Treasury's recommendation, although it did cap the deduction at 60 percent of a mutual institution's taxable income. H. Rept. 1447, 87th Cong., 2d Sess., 1962-3 C.B. 405, 437-438.

---

[5]Staffs of the Treasury and Joint Comm. on Taxation, Mutual Savings Banks and Building & Loan Associations 4 (1951).

Similarly, during the legislative process leading up to the Tax Reform Act of 1969, Treasury again criticized the percentage method and urged its replacement with the bad debt reserve deduction based on actual experience. Tax Reform Studies and Proposals, U.S. Treasury Department, 91st Cong., 1st Sess. 458-475 (J. Comm. Print 1968); Technical Memorandum of Treasury Position, Tax Reform Act of 1969, H. Rept. 13270, 80-84 (J. Comm. Print 1969). Congress again declined to abolish the method, although it did provide for a phased reduction in the maximum amount of the deduction to 40 percent of taxable income, while increasing the loss carryback and carryforward periods to protect institutions in the event of unusually heavy losses. H. Rept. 91-782, 1969-3 C.B. 644, 664; H. Rept. 91-413, 1969-3 C.B. 200, 280.

The 1978 regulations, however, contravene the clearly expressed intent of Congress by denying mutual institutions the benefit of section 593 to the extent they experience net operating losses. The 1978 regulations in effect recapture percentage method deductions to the extent to which NOL carrybacks are applicable. In the case of mutual institutions experiencing losses, the 1978 regulations therefore achieve what Congress repeatedly has denied Treasury: a form of repeal of the percentage method. The 1978 regulations thwart Congress' efforts to assure that mutual institutions would maintain adequate reserves to protect depositors by transforming reserve additions into little more than loans from the Treasury, to be called in when a mutual institution begins to suffer the consequences of a downturn in the economy.

Another justification mentioned by the Sixth Circuit was the statement in the 1978 memorandum that the method of calculating the bad debt reserve addition prescribed by the 1964 regulations resulted in an inappropriate and unintentional "pyramiding" of tax benefits. Evidently, Treasury found it objectionable that a mutual institution could reduce its taxable income by NOL carrybacks and still claim a reserve addition based on the amount of net income originally reported for a taxable year. Such a result was not found improper in Rev. Rul. 58-10, 1958-1 C.B. 246, in which the Commissioner ruled that the bad debt reserve addition should not be affected by events occurring after the year in which such addition was calculated. It appears that such a result would be problematic

only if the view is taken that a mutual institution applying an NOL carryback should be treated as if the NOL had actually been incurred in the carryback year, which is the position that Treasury apparently adopted in formulating the 1978 regulations. See G.C.M. 39701 (Feb. 25, 1988). We, however, fail to see why such a view is preferable to or more correct than the reasoning expressed in the 1958 ruling underpinning the 1964 regulation. Indeed, there is no "pyramiding" if the 1964 regulations are analyzed under the principles applicable to bad debt reserves, with which such regulations are in accord. As discussed above, the reasonableness of an addition to bad debt reserves is decided as of the year it is made, and subsequent events do not affect such decision. Consequently, a mutual institution that makes a reasonable addition to its reserves in one year does not receive an inappropriate or excessive benefit simply because later occurring events give rise to an NOL carryback to such year. Furthermore, as we pointed out in *Pacific First Federal,* section 593 does not allow a double deduction on account of bad debt losses, as actual losses are charged against the reserve and no deduction is obtainable for such losses. *Pacific First Federal Savings v. Commissioner,* 94 T.C. 101, 116 (1990). NOL's incurred by mutual institutions thus have no relationship to the bad debt reserve.

We also note a statement made in the 1978 memorandum which was not discussed by the Sixth Circuit but which discloses the apparent arbitrariness of Treasury's action. The 1978 memorandum states that the rule was not changed in the early 1970s, when initially considered by Treasury, because of poor economic conditions. If the change were being made because the rule was "patently wrong", as suggested by Treasury, we fail to see why Treasury did not go forward with its responsibility in carrying out its perception of Congress' intent. The fact that Treasury waited 7 years to effectuate the change in assumedly better economic times indicates that Treasury was usurping Congress' role in deciding how much and when to raise the effective tax on mutual institutions.

The Sixth Circuit identified an additional justification that was not mentioned in the 1978 memorandum. The Sixth Circuit reasoned that the "trend" in the congressional enactments toward a curtailment of the bad debt reserve deduction was evidence that Congress intended to reduce the deduction

available for addition to bad debt reserves and therefore Treasury's interpretation was consistent with such intent. *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d 289 (6th Cir. 1991). Such a justification appears to be a "post hoc rationalization" of the change that should not be considered. *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43, 50 (1983). Moreover, we note that the 1962 and 1969 reductions in the amount of the deduction were reached only after review of the tax situation of the industry and considerable negotiation between the two chambers of Congress. Congress undertook to reduce the size of the deduction in a measured, deliberate compromise. Congress, however, did not signal that the deduction was to be further reduced below the level it prescribed by legislation.

Finally, we are not convinced that Treasury adequately rebutted the "vital relevant comments" received by it from the industry during the period the changes were being considered. *Lloyd Noland Hosp. & Clinic v. Heckler,* 762 F.2d 1561, 1567-1568 (11th Cir. 1985).

For the foregoing reasons, we hold that Treasury failed to offer a cogent, persuasive explanation for the change as required by *Chevron.* Given the circumstances surrounding the 1969 changes to section 593, the 1978 regulations were not a reasonable interpretation of the statute and were inconsistent with what Congress intended. We must apply the Internal Revenue Code as Congress has written it, not as respondent would like it amended. Consequently, we adhere to our prior holding of *Pacific First Federal* that the 1978 regulations are invalid, and petitioner's motion for summary judgment will be granted.

To reflect the foregoing,

> *An appropriate order will be issued, and decision will be entered for petitioner.*

Reviewed by the Court.

NIMS, CHABOT, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, COLVIN, HALPERN, and BEGHE, *JJ.,* agree with the majority opinion.

WHALEN, *J.,* concurs in the result only.

HALPERN, *J.,* concurring. I write separately to emphasize the distinction between the reenactment doctrine and the reasoning of the majority.

As stated by the Court of Appeals for the Sixth Circuit in *People's Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d 289 (6th Cir. 1991), revg. T.C. Memo. 1990-129, a recent expression of the reenactment doctrine is found in NLRB *v. Bell Aerospace Co.,* 416 U.S. 267 (1974). In that case, where the National Labor Relations Board had consistently interpreted the Taft-Hartley Act of 1947 as excluding "managerial employees", the Supreme Court concluded that Congress' failure, when it amended the Act in 1959, "to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress". *Id.* at 275. Thus, the reenactment doctrine would appear to rest upon two assumptions: (1) That whenever Congress reenacts a statute, it is aware of the body of interpretation regarding that statute, and (2) that, in such circumstances, Congress' failure to countermand some aspect of that body of interpretation constitutes an affirmative sanction thereof. Together, those assumptions are capable of producing an inference that Congress has sanctioned a given regulation respecting an issue to which Congress has given little or no thought.

Apparently, it is that potential overbreadth that concerned the Sixth Circuit in *Peoples Federal Saving & Loan Association of Sidney v. Commissioner.*

The re-enactment doctrine is merely an interpretive tool fashioned by the courts for their own use in construing ambiguous legislation. It is most useful in situations where there is some indication that Congress noted or considered the regulations in effect at the time of its action. Otherwise the doctrine may be as doubtful as the silence of the statutes and legislative history to which it is applied. [*Id.* at 302-303. Fn. ref. omitted].

Unfortunately, the Sixth Circuit failed to understand that implicit in the compromise achieved by Congress in 1969 is some understanding regarding taxable income. As we noted in *Pacific First Federal Savings v. Commissioner, supra* at 111:

The House Report also contains a number of statistics, including the following:

| Tax as a percent of economic income | 1966 |
|---|---|
| A. Commercial banks | 23.2 |
| B. Mutual savings banks | 6.1 |
| C. Savings and loan associations | 16.9 |

In response to the foregoing statistics, the House Report comments:

Since your committee's bill increases appreciably the 23.2 percent effective rate of tax for commercial banks, it is your committee's intention not only to bring the level of taxation of mutual savings banks (presently 6.1 percent) up to the level of savings and loan associations (16.9 percent), but also to provide an increase in the 16.9 percent rate somewhat comparable to the increase in the 23.2 percent rate for commercial banks. * * * [H. Rept. 91-413, 1969-3 C.B. at 278.]

Undoubtedly, Congress was aware of the definition of "taxable income" used in computing the percentage-of-taxable-income bad debt deduction when it considered the existing and expected percentage of economic income to be paid as taxes by mutual savings banks. Moreover, there are two readily apparent ways Congress could have chosen to modify that deduction to increase the tax paid by mutual savings banks. The 1969 Congress could have elected (1) to reduce the base against which the percentage was applied to something less than what it was understood to be at that time or (2) to reduce the percentage of taxable income allowed to be deducted. With respect to the goal of achieving the proper aggregate tax to be achieved from mutual savings banks overall, it would have made little difference whether Congress chose the former, the latter, or some combination of the two. Whether the percentage bad debt deduction was to be computed by taking, for example, two-thirds of 50x or one-third of 100x would have been, quite logically, immaterial with respect to the total tax sought to be collected. However, given the relationship between the definition of taxable income and the percentage thereof deductible, Congress' decision to adjust the latter is only meaningful if it presupposes a particular definition of the former. Given that there was no discussion of altering the then established rule of determining taxable income without respect to NOL's, Congress must have assumed that such rule would continue to apply.

Amazingly, however, the Court of Appeals for the Sixth Circuit has concluded that Congress simply did not care whether NOL's are to be deducted in arriving at the figure for taxable income. *People's Federal Savings & Loan Association of Sidney v. Commissioner, supra* at 301 ("there is no evidence in the legislative history of the statutes in question that Congress ever had a specific or particular intent with respect to the ordering rule to be applied in this case"). Pursuing that logic, Congress' struggle to determine the most appropriate extent of the bad debt deduction must seem quite comical. As the Sixth Circuit sees the matter, Congress was indifferent to the total percentage of economic income collected, overall, from the banking institutions in question: all Congress cared about was that the bad debt deduction be limited to a particular percentage of an indeterminate income base.

The facts belie the Sixth Circuit's apparent conclusion that Congress has acted in that irrational a manner. In 1969, it was settled that taxable income was determined without taking NOL's into account. Congress' computations, discussions, and the eventual compromise must necessarily have been based upon that understanding of what taxable income meant.[1] Accordingly, the Commissioner's use of a different definition of taxable income is, in this context, inconsistent with the Tax Reform Act of 1969. I respectfully concur with the majority.

CHABOT, HAMBLEN, and BEGHE, *JJ.,* agree with this concurring opinion.

GERBER, *J.,* dissenting. I respectfully dissent for the reasons already expressed in the dissenting opinion at *Pacific First Federal Savings v. Commissioner,* 94 T.C. 101, 117-126 (1990), and because the majority has not presented persuasive or compelling reasons for disagreeing with the rationale of the

---

[1]Unfortunately, Congress does not appear to have said so explicitly. No Code provision or quotation from the written legislative history can be produced to directly support the point. That does not mean, however, that Congress was indifferent with respect to the ordering rule at question in this case. Where logical reasoning, applied to the sum of the facts and circumstances, can disclose a clear congressional intent, we are obliged to utilize that tool.

Sixth Circuit Court of Appeals in *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d 289 (6th Cir. 1991), revg. T.C. Memo. 1990-129.

The majority's opinion provides us with a large body of Supreme Court articulations concerning the review of regulations which, irrespective of one's particular leaning, would adequately support one's position. The majority's opinion, however, does not provide an adequate rationale or explanation for invalidating the regulations under consideration.[1] That was the shortcoming found by the Court of Appeals in *Peoples Federal Savings & Loan Association of Sidney v. Commissioner, supra.*

The majority's explanation of the Sixth Circuit's opinion is substantially more complex than the Sixth Circuit's opinion. The Circuit Court's opinion addresses the method of review and the role of the judiciary in reviewing regulatory promulgations. The Circuit Court pointed out that, irrespective of whether or not the statute is ambiguous, where an administrative agency's regulatory formulation is a permissible and reasonable interpretation, "a court may not substitute its own construction." *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d at 300. The Circuit Court also reviewed the reasons for the Secretary's change of position and admission of an erroneous position (in the earlier regulations) and found the reversal of policy to be reasonable. Some of the Circuit Court's reasoning is also to be found in the *Pacific First Federal Savings v. Commissioner, supra,* dissenting opinion.

In declining to follow the Sixth Circuit's opinion, the majority evaluated and countered each of the Secretary's reasons for reversing the regulation policy. Suffice it to note that the majority's reasons do not negate those of the Circuit Court, but simply reiterate some of the reasoning from *Pacific First Federal Savings v. Commissioner, supra,* and add a few countervailing reasons where prior opinions of this Court did not address the Circuit Court's reasoning. In sum and

---

[1] In this regard, the majority's opinion here is no less deficient than the majority's opinion in *Pacific First Federal Savings v. Commissioner,* 94 T.C. 101 (1990), or the opinion in *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* T.C. Memo. 1990-129, revd. 948 F.2d 289 (6th Cir. 1991).

substance, the majority has, a second time, provided some of the same and some alternative reasons for its interpretation, but has not shown the Secretary's interpretation to be an unreasonable or impermissible one.

The rule, correctly articulated by the Circuit Court, is intended to keep courts from substituting their judgment for that of administrative agencies. The majority's holding violates the rule's proscriptive purpose.

PARKER, JACOBS, WRIGHT, PARR, and RUWE, *JJ.,* agree with this dissent.