THE PERKIN-ELMER CORPORATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28860–89.      Filed September 28, 1994.

*Robert J. Cunningham, James M. O'Brien,* and *Debra Falduto Novack,* for petitioner.

*Victoria W. Fernandez,* for respondent.

OPINION

TANNENWALD, *Judge:* In *Perkin-Elmer Corp. v. Commissioner,* T.C. Memo. 1993–414, we decided, after trial, a severed issue under section 482.[1] A second issue, involving sec-

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code and the

tion 902, has been conceded by petitioner. The sole issue left for consideration is whether section 1.861–8(e)(3)(ii), Income Tax Regs., validly apportions research and development (R&D) expenses for petitioner's 1978–81 taxable years, ending July 31, for purposes of computing a foreign tax credit limitation under section 904.

The case was submitted fully stipulated pursuant to Rule 122. The stipulated facts are found accordingly.

The Perkin-Elmer Corp. (P-E) is a corporation organized under the laws of New York with its principal office located in Norwalk, Connecticut. P-E and affiliated subsidiaries filed consolidated Federal income tax returns.

During the years in issue, P-E owned between 99 and 100 percent of Perkin-Elmer, Ltd. (Limited), a corporation organized under the laws of the United Kingdom, and 92 percent of Bodenseewerk Perkin-Elmer & Co., G.m.b.H. (BSW), a corporation organized under the laws of the Federal Republic of Germany. Since Limited and BSW were foreign corporations, they were not includable in the consolidated return. See sec. 1504(b)(3).

P-E, Limited, and BSW each engaged in basic, strategic, tactical and sustaining R&D activities relevant to the applicable product categories.[2]

During the years at issue, the sales of the applicable product categories by P-E, Limited, BSW, and certain other entities which had no R&D expenses but whose sales are required to be taken into account by the regulation at issue were as follows:

|  | 1978 | 1979 | 1980 | 1981 | Total |
|---|---|---|---|---|---|
| P-E | $273,418,705 | $380,749,454 | $540,383,328 | $619,667,243 | $1,814,218,730 |
| Limited | 19,564,174 | 24,904,668 | 35,432,650 | 39,552,012 | 119,453,504 |
| BSW | 28,833,720 | 37,464,766 | 43,738,557 | 39,968,057 | 150,005,100 |
| PECC | 4,710,669 | 3,616,006 | 11,340,405 | 10,564,868 | 30,231,948 |
| PKN | - 0 - | - 0 - | - 0 - | 165,683 | 165,683 |
| Other | - 0 - | 250,210 | 9,020 | - 0 - | 259,230 |
| Total | 326,527,268 | 446,985,104 | 630,903,960 | 709,917,863 | 2,114,334,195 |

regulations thereunder for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] See sec. 1.861–8(e)(3)(i)(A), Income Tax Regs. The parties are in agreement as to these categories.

During the years at issue, R&D expenses of P-E, Limited, and BSW in respect of the applicable product categories were as follows:

|  | 1978 | 1979 | 1980 | 1981 | Total |
|---|---|---|---|---|---|
| P-E | $12,916,236 | $25,052,637 | $33,557,434 | $39,164,000 | $110,690,307 |
| BSW | 1,774,680 | 2,021,809 | 2,503,899 | 2,454,560 | 8,754,948 |
| Limited | 1,025,640 | 1,464,397 | 2,188,088 | 2,592,000 | 7,270,125 |
| Total | 15,716,556 | 28,538,843 | 38,249,421 | 44,210,560 | 126,715,380 |

Limited and BSW deducted their R&D expenses for purposes of their income taxes in the United Kingdom and the Federal Republic of Germany, respectively.

During the years at issue, P-E, Limited, and BSW each had direct R&D expenses which averaged about 6 percent of their respective sales.[3]

Under the sales method set forth in section 1.861–8 (e)(3)(ii), Income Tax Regs. (hereinafter referred to as the regulatory sales method), respondent allocated the R&D expenses of P-E by first allocating to P-E the exclusive apportionment provided by the regulation (50 percent for the 1978 taxable year, 40 percent for the 1979 taxable year, and 30 percent for the 1980 and 1981 taxable years). Respondent then allocated the remaining R&D expenses of P-E by applying a fraction that had, as its numerator, the respective foreign sales of P-E, Limited, BSW, and the other entities that had no R&D expenses and are therefore only indirectly affected by the dispute herein and, as its denominator, the total sales of P-E, Limited, and BSW and those other entities. The regulatory sales method did not take into account the R&D expenses of Limited and BSW. It produced an apportionment of the R&D expenses of P-E that averaged 5.5 percent, 9.5 percent, and 9.2 percent of the respective sales of P-E, Limited, and BSW.

Petitioner's method of allocation (hereinafter referred to as the worldwide method) utilized the same sales fraction as that employed by respondent but applied that fraction to a figure which is described as worldwide R&D expenses (in this case only P-E, Limited, and BSW had such expenses) in order

---

[3] Four-year averages of R&D and sales (000's omitted) are as follows:

|  | P-E | Limited | BSW | Total |
|---|---|---|---|---|
| R&D | $110,690 | $7,270 | $8,755 | $126,715 |
| Sales | 1,814,219 | 119,454 | 150,005 | 2,083,678 |
| R&D as % of sales | 6.1 | 6.1 | 5.8 | 6.1 |

to determine the amount of the R&D expenses of P-E allocated to each entity to which an allocation was required by the regulation. Petitioner's method did not first make the exclusive apportionment to P-E required by the regulation. Petitioner's method also reflected further limitations in that (1) when the amounts of P-E's R&D expenses allocated to Limited and BSW were less than the actual amounts of their R&D expenses, the latter amounts were used, and (2) when the amounts of P-E's R&D expenses allocated to Limited and BSW were in excess of the amounts of their actual R&D expenses, then only such excess was allocated to them. Petitioner's method produced an apportionment of the R&D expenses of P-E which averaged 6.0 percent, 6.2 percent, and 6.2 percent of the sales of P-E, Limited, and BSW, respectively.

Limited and BSW benefited from P-E's R&D activity, and P-E benefited from Limited's and BSW's R&D activity. Because of the breadth of P-E's product lines and the larger amount of R&D expenditures made by P-E, the amount of benefits flowing from P-E to BSW and Limited was greater than that flowing from BSW and Limited to P-E.

Petitioner's U.S. tax liability, net of foreign tax credits allowed under section 904 for the 1975-81 taxable years, based on the apportionment of P-E's R&D expenses under the regulatory sales method and petitioner's worldwide method, was as follows:

| Year | Regulatory sales method | Petitioner's method | Increase/ (decrease) to U.S. tax liability |
|------|-------------------------|---------------------|--------------------------------------------|
| 1975 | $6,665,310 | $6,665,310 | -0- |
| 1976 | 10,302,055 | 10,385,467 | ($83,412) |
| 1977 | 13,388,368 | 13,586,773 | (198,405) |
| 1978 | 16,427,201 | 16,061,595 | 365,606 |
| 1979 | 25,796,090 | 25,048,643 | 747,447 |
| 1980 | 31,079,788 | 29,792,426 | 1,287,362 |
| 1981 | 39,701,145 | 41,819,743 | (2,118,598) |
| Total | 143,359,957 | 143,359,957 | -0- |

Petitioner will incur additional interest expense in the amount of $348,486 under section 6601 if the regulatory sales method, instead of the worldwide method, is used to

determine petitioner's foreign tax credits under section 904 for the 1978–81 taxable years at issue herein.

Resolution of the issue confronting us will determine the extent to which petitioner may claim a foreign tax credit under section 901, subject to the limitation in section 904, which restricts the credit to the amount of the precredit U.S. tax, computed without the benefit of the credit, which taxable income from sources without the United States bears to worldwide taxable income. In order to compute the numerator of that fraction, it is necessary to determine the deductions properly apportioned and allocated thereto and a ratable part of deductions that cannot be definitely allocated. See *infra* p. 471. It is readily apparent that the smaller the numerator the lesser the amount of the foreign tax credit available and conversely the larger the numerator the larger the availability of such credit. It is in this context that the parties have locked horns in respect of the allocation of R&D expenses under section 1.861–8(e)(3)(ii), Income Tax Regs.

Petitioner asserts that the method of apportionment under that regulation is invalid. It argues that the regulation unreasonably ignores the R&D expenses incurred by Limited and BSW in allocating P-E's R&D expenses to foreign-source income,[4] with the result that Limited and BSW bear a disproportionately high percentage of R&D expenses compared to sales. Petitioner maintains that this directly contravenes sections 862(b) and 901 and violates the factual nexus, i.e., "factual relationship", standard of section 1.861–8(a)(2), Income Tax Regs., and the "inherently speculative" R&D concept specified in section 1.861–8(e)(3)(i), Income Tax Regs. In addition, petitioner argues that the history of section 1.861–8(e)(3), Income Tax Regs., corroborates the unreasonableness, and thus the invalidity, of the regulation. Petitioner contends that, as a result of the regulation, its foreign tax credit is improperly reduced because amounts are allocated to its foreign subsidiaries that do not take into account the direct expenses incurred by the subsidiaries, and therefore petitioner is exposed to double taxation because the amount so

---

[4] The term "foreign-source income" will be used to refer to the term gross "income from sources without the United States", the term defined in sec. 862(a). Similarly, the term "U.S.-source income" will be used to refer to gross "income from sources within the United States", as defined in sec. 861(a). Likewise, taxable income from within/without the United States, as used in secs. 861(b) and 862(b), will be referred to as "U.S./foreign-source taxable income".

allocated may not be deductible by the subsidiaries for purposes of the foreign income taxes to which they are subjected.

Respondent counters that the regulations harmonize with the language, intent, and purpose behind sections 861–864 and 904, discussed below, and that criticisms of the regulatory sales method are not sufficient to justify our holding the regulation invalid.

## Standards for Judging Validity of Regulations

Initially, we note (and the parties agree) that section 1.861–8(e)(3)(ii), Income Tax Regs., was promulgated pursuant to the general authority granted to the Secretary of the Treasury by section 7805(a) and not pursuant to specific legislative authority; it is therefore interpretative. *Jackson Family Found. v. Commissioner,* 97 T.C. 534 (1991), affd. 15 F.3d 917 (9th Cir. 1994); see *St. Jude Medical, Inc. v. Commissioner,* 97 T.C. 457, 482–483 (1991), affd. in part, revd. in part and remanded 34 F.3d 1394 (8th Cir. 1994), dealing with section 1.861–8(e)(3), Income Tax Regs., in another context. "Accordingly, 'we owe the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision.'" *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982) (quoting *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981)). An interpretative regulation will be upheld if it is found to "'implement the congressional mandate in some reasonable manner'". *United States v. Vogel Fertilizer Co., supra* at 24 (quoting *United States v. Correll,* 389 U.S. 299, 307 (1967)). In implementing these principles, we look to the guidelines set forth in *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979):

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the

degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. [Citations omitted.]

*Statutes*

The regulation is an interpretation of section 861, but it is part of the scheme also incorporating sections 862 and 901 through 904 by which foreign tax credits are computed. *Associated Telephone & Telegraph Co. v. United States,* 199 F. Supp. 452, 465 (S.D.N.Y. 1961), affd. on this issue 306 F.2d 824 (2d Cir. 1962).

Sections 861–864 deal with the determination of source of income. Sections 861 and 862 source specific items of gross and taxable income from U.S. and foreign sources, respectively. Sections 861(b) and 862(b) are substantially unchanged from the time when they were enacted as section 217(b) and (d) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 243–244. Section 861(b) provides in pertinent part:

SEC. 861(b). TAXABLE INCOME FROM SOURCES WITHIN UNITED STATES.— From the items of gross income specified in subsection (a) as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a *ratable part* of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as taxable income from sources within the United States. * * * [Emphasis added.]

Section 862(b) mirrors section 861(b) with regard to taxable income from sources without the United States.

The predecessor of section 901 was enacted as section 238(a) of the Revenue Act of 1918, ch. 18, 40 Stat. 1057, 1080–1081 (1919), to provide relief from U.S. taxation where income was already taxed by another country. *American Chicle Co. v. United States,* 316 U.S. 450, 451 (1942). Under section 901, a taxpayer may elect to claim a credit for foreign taxes paid, subject to the limitation of section 904. Domestic corporations may also claim a credit for the taxes deemed paid under sections 902 and 960 where the corporation owns at least 10 percent of a foreign corporation. If the election under section 901 is not made, a taxpayer may deduct the taxes paid under section 164.

The overall limitation language of section 904 was added in 1921 as part of section 238(a) by the Revenue Act of 1921,

ch. 136, 42 Stat. 227, 258, to prevent foreign tax credits from eliminating U.S. tax on U.S.-source income. *Theo. H. Davies & Co. v. Commissioner,* 75 T.C. 443, 446 n.9 (1980) affd. 678 F.2d 1367 (9th Cir. 1982).

*Origins of Section 1.861–8(e)(3), Income Tax Regs.*

The Commissioner first attempted to create special allocation and apportionment rules for R&D expenses under sections 861(b) and 862(b) in 1973. Sec. 1.861–8(e)(3), Proposed Income Tax Regs., 38 Fed. Reg. 15840, 15843–15844 (June 18, 1973). The proposed regulations introduced an apportionment formula that incorporated the sales of controlled and uncontrolled foreign corporations. In 1976, new proposed regulations introduced the allocation method based on product categories and an allocation of all R&D expenses. The final regulations, issued on January 3, 1977, made several changes in response to concerns voiced by taxpayers. See Report of the Department of the Treasury, "The Impact of the Section 861–8 Regulation on U.S. Research and Development" 8 (June 1983); S. Prt. 98–169 (Vol. I), at 883 (1984). One concern was directed to what was considered an overallocation to foreign source income and was met, in the final regulations, by providing for an initial exclusive allocation of a fixed percentage of R&D expenses to U.S.-source income. See Feinschreiber, "Allocation and Apportionment of Research Expenses," 4 Intl. Tax J. 902, 908 (1978).

Section 1.861–8(a), Income Tax Regs., "provides specific guidance for applying the cited Code sections [sections 861 to 863] by prescribing rules for the allocation and apportionment of expenses, losses, and other deductions". Section 1.862–1(b), Income Tax Regs., provides that computation of taxable income from sources without the United States shall be determined on the same basis as that used in section 1.861–8, Income Tax Regs., for taxable income within the United States.

Section 1.861–8(e)(3)(ii)(A), Income Tax Regs., first allocates a fixed percentage of R&D expenses to the geographic source "where the research and development activities which account for more than fifty percent (50%) of the amount of such deduction were performed." The fixed percent was 50 percent for taxable years beginning during 1977, 40 percent

for 1978, and 30 percent for each year thereafter. The regulation permits a taxpayer to make a larger fixed allocation if it satisfies the Commissioner that a larger allocation is warranted, i.e., in cases of limited or long-delayed application of the R&D outside of the United States. Section 1.861–8(e)(3)(ii)(B), Income Tax Regs., then apportions the remaining amount between U.S. and foreign source "in the same proportions that the amount of sales from the product category (or categories) which resulted in such gross income * * * bear respectively, to the total amount of sales from the product category (or categories)."

For purposes of the apportionment under subdivision (ii)(B), sales include those of related and unrelated parties, such as licensees, which can reasonably be expected to benefit from the research expense in the product category. Sec. 1.861–8 (e)(3)(ii)(C) and (D), Income Tax Regs. Sales between or among controlled corporations are only taken into account once. If the controlled corporation has entered into a cost-sharing agreement under section 1.482–2(d)(4), Income Tax Regs., then the controlled corporation is not reasonably expected to benefit from the research expense.

*Legislative History of Section 1.861–8(e)(3), Income Tax Regs.*

The regulations were subject to considerable criticism, among which was the following:

Fifth, we also suggest that taxpayers be permitted to elect to reflect foreign R&D expenses in the "R&D base" if they so chose. Many multinational taxpayers' subsidiaries operate substantial R&D facilities abroad and the contribution of these facilities to taxpayers' R&D efforts is not currently reflected in Treas. Reg. §1.861-8(e)(3). Since worldwide sales may be taken into account, we believe that taxpayers should be permitted the option of including worldwide R&D expenditures. Although the regulation contains a special provision covering section 482 cost-sharing arrangements, mutualized cost-sharing frequently is not recognized by foreign taxing authorities with respect to the cost of research performed outside their borders. ["Suggestions for Improving Treas. Reg. §1.861–8, a Report Prepared by the Foreign Tax Credit Subcommittee of the American Bar Association's Tax Section's Committee on Foreign Activities of U.S. Taxpayers," 5 Intl. Tax J. 109, 116 (1978); fn. ref. omitted.]

See also "Optimizing the benefits from R&D expenses under the allocation and apportionment Regs.," 48 J. Taxn. 332,

338 (1978); Fuller & Granwell, "The Allocation and Apportionment of Deductions", 31 Tax Law. 125, 151 (1977).

In 1981, Congress placed a temporary moratorium until 1983 on section 1.861–8(e)(3), Income Tax Regs., directing that all U.S. R&D expenses be allocated to U.S.-source income, and ordering a Treasury study on the general policy and economic effects of allocating U.S. R&D expenses to foreign-source income. Economic Recovery Tax Act of 1981, Pub L. 97–34, sec. 223, 95 Stat. 249. One reason for enacting the moratorium was that some foreign countries do not allow deductions under their tax laws for R&D performed in the United States. See S. Rept. 99–146, at 379–380 (1985); H. Rept. 99–426 (1985), 1986–3 C.B. (Vol. 2) 1, 385–386. Taxpayers complained that this raised the effective cost of R&D and put U.S.-based R&D at a competitive disadvantage, in that allocation of R&D expenses to foreign-source income had the effect of reducing the foreign tax credit to U.S. taxpayers, while not actually reducing the U.S. taxpayers' foreign tax liability. Consequently, there was an incentive to relocate R&D to countries that would allow a deduction for R&D performed locally but would not allow a deduction for R&D performed in the United States. See Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 142 (J. Comm. Print 1981). In order to permit further study, the moratorium was subsequently extended until 1986 without change in the statutory allocation formula. Deficit Reduction Act of 1984, Pub. L. 98–369, sec. 126, 98 Stat. 494, 648; Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99–272, sec. 13211, 100 Stat. 82, 324 (1986).

At the time of the enactment of the Tax Reform Act of 1986, Pub. L. 99–514, sec. 1216, 100 Stat. 2085, 2549, Congress concluded that the existing situation was an inefficient means of promoting research in the United States. The previous year, the House Ways and Means Committee had explained:

As a matter of tax policy, the committee is of the view that it is appropriate to require the allocation of deductible expenses (including research expenses) between U.S. and foreign source income. A tax incentive for research that conflicts with this basic tax policy principle should not, in the committee's view, be retained at least absent a showing that it is the best such incentive device available. * * *

Because of the importance of U.S.-based research activity, the committee will continue to study whether any additional permanent tax incentives for U.S. research might be appropriate. The committee considers it important that the relative equity and efficiency of alternative tax incentives be fully analyzed before any decision is made to adopt an additional permanent tax incentive.

While the committee and Congress study these issues further (for a two-year period), the bill provides temporary rules for allocation of research expense that *are based on the approach of the Treasury regulation,* but that liberalize the Treasury regulation in certain respects. * * * These temporary modifications to the regulation's allocation rules are intended only to provide an additional tax incentive to conduct research in the United States while Congress analyzes whether any additional permanent incentive is necessary or feasible. * * * *The temporary modifications do not reflect a judgment by the committee that any provision of the existing Treasury research expense allocation rules is necessarily inadequate or inappropriate.*

[H. Rept. 99–426 (1985), 1986–3 C.B. (Vol. 2) 1, 387; emphasis added.[5]]

In 1986, the conference committee report confirmed the view expressed by the House Ways and Means Committee as follows:

Because of the importance of U.S.-based research activity, the conferees encourage the tax-writing committees to continue to study whether any additional permanent tax incentives for U.S. research might be appropriate. The conferees consider it important that the relative equity and efficiency of alternative tax incentives be fully analyzed before any decision is made to adopt a permanent tax incentive. *The conference agreement does not reflect a judgment by the conferees that any provision of the existing regulation is necessarily correct or incorrect.* It is anticipated that the Treasury Department will expeditiously pursue a permanent resolution of the allocation issue. The conferees do, however, consider it important that the Treasury Department reexamine its regulations in light of concerns expressed by the tax-writing committees of both Houses. Moreover, the conferees expect that the Treasury Department, in connection with the U.S. treaty process, will resolve any incompatibility with foreign tax systems that may arise if the regulations were to go into effect. [H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 608; emphasis added.]

The Tax Reform Act of 1986 replaced the 1981 allocation formula with a further temporary statutory allocation. It provided for an exclusive apportionment of 50 percent of R&D expense to U.S. source income (raising the amount provided by the regulation) and applied only to U.S.-based R&D

---

[5] While the committee decided in 1985 that the moratorium was an inefficient means, Congress extended the moratorium for another year pending the comprehensive Tax Reform Act of 1986. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99–272, sec. 13211, 100 Stat. 82, 324.

expenses, and only for purposes of geographic sourcing of income for the computation of foreign tax credits. Tax Reform Act of 1986, Pub. L. 99–514, sec. 1216, 100 Stat. 2085, 2549. The Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, sec. 4009, 102 Stat. 3342, 3653–3655, further extended the temporary modification, but raised the exclusive apportionment to 64 percent.

These temporary modifications were replaced, again on a temporary basis, by section 864(f), added in the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101–239, sec. 7111, 103 Stat. 2106, 2326–2328. Section 864(f) adopted the exclusive apportionment and utilized the sales method of section 1.861–8(e)(3), Income Tax Regs., but specified that 64 percent of expenses for R&D conducted in the United States was to be allocated to U.S.-source income and 64 percent of expenses for R&D conducted outside the United States was to be allocated to foreign-source income. Section 864(f) was temporarily extended twice. Omnibus Budget Reconciliation Act of 1990, Pub. L. 101–508, sec. 11401, 104 Stat. 1388, 1388–472; Tax Extension Act of 1991, Pub. L. 102–227, sec. 101, 105 Stat. 1686.

In 1992, respondent issued revenue procedures granting transitional relief pending the expiration of section 864(f). Rev. Proc. 92–56, 1992–2 C.B. 409, amplified by Rev. Proc. 92–69, 1992–2 C.B. 435. Respondent explained:

This transition method is not intended to suggest any views about the proper allocation and apportionment of research and development expenditures. It is intended solely to provide taxpayers with transition relief and to minimize audit controversy and facilitate business planning during the conduct of the regulatory review.

More recently, Congress was made aware of the problem facing petitioner in a January 15, 1993, report, prepared by the Department of the Treasury, entitled "International Tax Reform: An Interim Report".[6] The Treasury report suggested an alternative to section 1.861–8(e)(3), Income Tax Regs., whereby R&D expenses would be apportioned using a "worldwide fungibility" approach, similar to that offered by peti-

[6] In 1992, in respect of the revenue-related provisions pending before the House Ways and Means Committee, Chairman Rostenkowski noted the need for the regulations "to take into consideration that taxpayers, in appropriate circumstances, are required for business purposes to conduct significant amounts of R&D at foreign sites and should not be penalized by allocation rules." Chairman's Mark at 23 (J. Comm. Print, June 23, 1992).

and BSW the actual amount of their R&D expenses even when such amount exceeds their proportional share of worldwide R&D expenses; i.e., any excess of the actual share of Limited or BSW minus their proportional share is not allocated to P-E. As a result, petitioner's worldwide method presents a facially acceptable result, although it cannot be gainsaid that it first indulges in an impermissible allocation to P-E of the R&D expenses of Limited and BSW by including those expenses in the worldwide expenses to be allocated.

Petitioner relies heavily upon the factual nexus element which it says is required by the statute and reflected in the regulations; i.e., "the factual relationship of deductions to gross income". Sec. 1.861–8(a)(2), Income Tax Regs. Petitioner would have us read the statute as imposing a mandatory allocation whenever there is any connection between income and deductions. As we see it, petitioner weaves too tenuous a pattern. Similarly, petitioner's attempt to exploit the reference in the regulation to research and development as "inherently speculative activity", sec. 1.861–8(e)(3)(i), Income Tax Regs., misses the point. That reference is geared to the uncertain nature of the benefits of such activity and to the undeniable fact that such activity is often unsuccessful in producing income. See sec. 1.861–8(e)(3)(i)(A), Income Tax Regs. Indeed, if such reference makes any contribution to the resolution of the issue before us, it supports the position that there must be concrete evidence of the extent of the benefit to be derived by the entities to whom an allocation of research and development is to be made, taking into account, as does the regulation at issue herein, that research and development often benefits the market nearest to where it is performed. In sum, we do not accept the assumption that the benefits of research and development are spread equally among the entities involved. See Feinschreiber, "Allocation and Apportionment of Research Expenses," 4 Intl. Tax J. at 909. Moreover, we note that the regulation specifically recognizes the reality of uneven distribution of such benefits by permitting taxpayers to persuade respondent to allow a greater fixed allocation to U.S.-source income, see *supra* pp. 471–472, or to sidestep the regulatory allocation by a cost-sharing agreement with a controlled party, see sec. 1.861–

8(e)(3)(ii)(D), Income Tax Regs.[7] Petitioner did not seek to utilize either of these opportunities.

Nor are we impressed with petitioner's argument that we should apply to R&D expenses the "fungibility" concept, found in the interest expense regulation. See sec. 1.861–8(e)(2)(i), Income Tax Regs. The "fungibility" of interest has been the subject of consideration by respondent in promulgating the regulations and of the Congress. See *Bowater Inc. & Subs. v. Commissioner,* 101 T.C. 207, 211–214 (1993); Department of the Treasury, "International Tax Reform: An Interim Report" 31–34 (Jan. 15, 1993). In *Bowater,* we specifically pointed out that the regulations dealing with research and development do not apply a fungibility concept. 101 T.C. at 212 n.2.

In a similar vein, we reject respondent's attempt to capitalize on the fact that because of carryforwards and carrybacks of foreign tax credits, see *supra* p. 467, petitioner has not in fact been subjected to a double tax burden. Telescoping is inappropriate; each taxable year must stand on its own feet. *Brunswick Corp. & Subs. v. Commissioner,* 100 T.C. 6 (1993).

Finally, we direct our attention to the impact on respondent's regulation of the legislative history which we have set forth at some length herein. See *supra* pp. 472–475. Each party contends that such history supports her respective position.

Respondent contends that such history and the codification of the sales method in section 864(f) validates her regulation. We disagree. Initially, we note the circumstances herein make clear that the doctrine of statutory reenactment does not apply. See *Lykes v. United States,* 343 U.S. 118 (1952); cf. *Gresham v. Commissioner,* 79 T.C. 322, 330 (1982), affd. 752 F.2d 518 (10th Cir. 1985). What is more, we think it impossible to accept respondent's contention where, as is the case herein, Congress has expressly stated that it was not taking a position on whether the regulation involved herein

---

[7] The regulation provides that if a controlled foreign subsidiary is a party to a cost-sharing agreement, then the sales of the subsidiary shall not reasonably be expected to benefit from the parent's share of the research expense. The sales of the subsidiary would then not be included in the regulation's apportionment formula, so that R&D expenses of the parent will not be allocated to foreign source income. Of course, the expenses borne by the subsidiary under the terms of the cost-sharing agreement reduce foreign taxable income and thus foreign tax credits. In summary, a cost-sharing agreement can be used to ensure that the allocation of R&D expenses reflects the factual circumstances.

was "correct or incorrect" and that its action, at least on one occasion, was "not unambiguous". See *supra* pp. 473, 476; *St. Jude Medical, Inc. v. Commissioner,* 97 T.C. at 486. In this connection, however, we note that Congress may have added section 864(f) to bring certainty to the issue. H. Rept. 103–111, at 707, 712 (1993); compare S. Rept. 103–36, at 347, 350 (1993), which opted for a temporary extension. In any event, as will subsequently appear, we find it unnecessary to go as far as respondent would have us go in terms of legislative validation.

*St. Jude Medical, Inc. v. Commissioner, supra,* clearly has no bearing on the issue before us herein. In that case, the taxpayer argued that U.S.-based R&D was excludable in full from the taxable income determination under the domestic international sales corporation (DISC) rules, secs. 991–997, because of the 1981 moratorium. See *supra* p. 473. We held only that the moratorium is inapplicable to a DISC and that, for purposes of computing taxable income under the DISC rules, section 1.861–8(e)(3), Income Tax Regs., was valid. The distinctive position of the DISC rules is clearly supported by the legislative history, which shows that, in enacting the moratorium, Congress was concerned only with the geographic sourcing of expenses for purposes of the foreign tax credit computation. See *supra* p. 473. Furthermore, the issue in *St. Jude* was the application of section 1.861–8(e)(3), Income Tax Regs., to product categories and not its application to geographic sourcing, which is involved herein. The reversal of our holding that the regulation was valid was directed to the former application.

Petitioner's argument is that the legislative history of the regulation demonstrates its unreasonableness. The regulation was formulated in 1973, more than five decades after the statutory allocation and the foreign tax credit provisions were enacted. Since that time, Congress has eight times enacted a moratorium or modification of the regulations.

Under *National Muffler Dealers Association v. United States,* 440 U.S. 472 (1979), congressional intervention would be a factor showing the lack of force of the regulation. But, as we have pointed out above, Congress expressly did not state whether the regulation (including the sales method) was "correct or incorrect" and, at least on one occasion, characterized its own action as "not unambiguous". Further,

with the expiration of the 1993 temporary provisions, Congress has now allowed the regulation to go back into effect.

In view of the foregoing, just as we have declined to hold that the legislative history validated respondent's regulation, we are not prepared to conclude that Congress found that the regulatory sales method failed to carry out the legislative mandate. Moreover, we think it significant that Congress has had the opportunity to refine that method in order to account for R&D performed by foreign subsidiaries on each of the eight occasions since 1981 when it legislated in the area. See *St. Jude Medical, Inc. v. Commissioner,* 97 T.C. at 485. It failed to do so despite the fact that it was aware that respondent's regulation had been the subject of public discussion and criticism. See *supra* pp. 472–473. This was particularly true at the time section 864(f) was extended temporarily in 1993. See *supra* p. 476.

Unquestionably, by ignoring Limited and BSW's R&D expenses, more of petitioner's R&D expenses are apportioned to foreign-source income under the regulatory sales method, thereby reducing foreign-source taxable income. Under the foreign tax credit limitation formula, this reduces the foreign tax credit available to petitioner. It cannot be gainsaid that petitioner's worldwide method produces a lesser allocation of P-E's R&D expenses to foreign entities and therefore reduces (but does not eliminate)[8] the potential for double taxation, admittedly the objective of the foreign tax credit. But, as the Supreme Court has pointed out in *United States v. Goodyear Tire & Rubber Co.,* 493 U.S. 132, 143–144 (1989), this objective cannot always be fully achieved. Moreover, it is not without significance that, under the regulations, see *supra* p. 471, petitioner could have sought to minimize this impact by seeking a larger exclusive allocation of the R&D expenses of P-E and thereby reducing or even eliminating that potential. Cf. *Associated Telephone & Telegraph Co. v. United States,* 306 F.2d 824, 833 (2d Cir. 1962).

On the other hand, unlike petitioner's method, respondent's method first allows an exclusive apportionment to U.S.-source gross income. Just as ignoring the expenses of foreign subsidiaries can result in greater worldwide tax liability, the

---

[8] Petitioner's method does not eliminate that potential since some of P-E's R&D expenses are still allocated to Limited and BSW and may not be deductible in computing their taxes.

exclusive apportionment reduces worldwide tax liability. The exclusive apportionment may even allow a greater deduction against U.S. income than is reflected by the circumstances in certain instances. For example, a corporation which performs research and development in the United States will have at least 30 percent of the expense allocated to U.S.-source income even when all its sales are abroad. This would be an overallocation of expenses to U.S.-source income, which has the potential of double benefit for taxpayers of less U.S. taxable income and a greater foreign tax credit limitation.

In sum, we are confronted with a situation where the legislative mandate is at best murky, and the two methods involved herein have their merits and demerits. Compare *Brunswick Corp. v. Commissioner,* 100 T.C. at 16, where we sustained a regulation of respondent, also in the foreign tax credit arena, despite its "imperfections" and despite later adoption of the taxpayer's formula by Congress. It may well be that petitioner's worldwide method produces better results in certain situations, but this, in and of itself, is not enough to justify our concluding that respondent's method is unreasonable. *United States v. Goodyear Tire & Rubber Co.,* 493 U.S. at 143–144; *United States v. Correll,* 389 U.S. 299, 306–307 (1967); cf. *Fulman v. United States,* 434 U.S. 528, 534–536 (1978); *Theo. H. Davies & Co. v. Commissioner,* 75 T.C. at 450. Applying the standards for determining the validity of regulations, see *supra* p. 469, we are unable to conclude that section 1.861–8(e)(3)(ii), Income Tax Regs., is unreasonable.

We hold for respondent on the section 861 issue.

In order to take into account the concessions of the parties and our holding on the section 482 issue,

*Decision will be entered under Rule 155.*