CENTRAL PENNSYLVANIA SAVINGS ASSOCIATION AND
SUBSIDIARIES, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE,
RESPONDENT

Docket No. 19498–89.          Filed March 30, 1995.

*Zachary P. Alexander* and *William S. Pilling III,* for petitioner.

*Paul J. Sude* and *Lisa Primavera-Femia,* for respondent.

OPINION

TANNENWALD, *Judge:*[1] This case is before us on petitioner's motion and respondent's cross-motion for summary judgment. Rule 121.[2] The sole issue is whether section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., is valid to the extent that it requires petitioner, in using the "percentage of taxable income method" to calculate additions to its bad debt reserve under section 593(b)(2)(A), to reflect the carryback of petitioner's net operating loss (NOL) from 1980 and later years in the computation of taxable income for the years at issue. The issue is not new to this Court. See *infra* pp. 386–389.

Summary judgment is appropriate in this case because there is no genuine issue of material fact and the decision can be made as a matter of law. Rule 121(b); *Northern Indiana Public Service Co. v. Commissioner,* 101 T.C. 294, 295 (1993). For the purposes of this motion, the relevant facts, set forth in an affidavit of petitioner's executive vice

---

[1] This case was reassigned to Judge Tannenwald pursuant to an order of the Chief Judge.

[2] All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

president and chief financial officer, are not in dispute and are so found.

Petitioner is a chartered mutual savings and loan association with its principal place of business in Shamokin, Pennsylvania. During the years at issue, petitioner was an institution described in section 593(a)(1), and filed Federal income tax returns on a calendar year basis with the Internal Revenue Service, Philadelphia, Pennsylvania.

For its 1980 tax year, petitioner claimed an NOL under section 172(c), which it carried back to certain tax years from 1970 through 1979 pursuant to section 172(b). Petitioner also claimed NOL's in subsequent years that affect certain of the years at issue herein.[3] The carryback of the 1980 NOL resulted in the carryback of investment tax credits to petitioner's 1968 and 1969 tax years. Petitioner timely filed Corporation Applications for Tentative Refund (Form 1139) for all tax years affected by the NOL carrybacks and related investment tax credit carryovers and carrybacks.

During certain tax years from 1968 to 1982, petitioner calculated the annual addition to its reserve for bad debts under the percentage of taxable income method provided in section 593(b)(2)(A) and deducted such addition in each such tax year on its Federal income tax returns in accordance with section 166(c). In conjunction with petitioner's filing of its tentative refund applications stemming from its carryback of the 1980 NOL, petitioner recomputed its allowable bad debt deductions under the percentage of taxable income method for such affected years in accordance with the then-existing section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs. The recomputation resulted in a smaller loan loss reserve deduction.

Subsequent to the filing of the tentative refund applications, respondent conducted an examination of petitioner's tax returns for the 1968 to 1982 tax years. Following the examination, respondent mailed petitioner a notice of deficiency disallowing petitioner's treatment of two items not

---

[3] The Court may consider NOL's in years not at issue where they are carried back to years that are in issue. *Lone Manor Farms, Inc. v. Commissioner*, 61 T.C. 436, 440 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975).

now at issue herein and determining the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1969 | $24 |
| 1970 | 61,365 |
| 1973 | 51,543 |
| 1974 | 125,107 |
| 1976 | 83,786 |
| 1977 | 174,393 |
| 1978 | 167,275 |
| 1979 | 157,909 |
| 1980 | 31,309 |

Thereafter, in 1990, this Court held section 1.593–6A (b)(5)(vi) and (vii), Income Tax Regs., invalid to the extent that it required that taxable income reflect any NOL carryback in calculating the addition to the bad debt reserve under the percentage of taxable income method, in a case involving a similarly situated taxpayer and essentially the same set of circumstances. *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. 101 (1990), revd. 961 F.2d 800 (9th Cir. 1992) (*Pacific First*).

Petitioner thereafter, without objection by respondent, amended its petition herein to raise the issue of the application of section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., claiming that, if the regulation is invalid, it is entitled to a refund for overpayments of income tax.

The issues which were the subject of respondent's notice of deficiency having been settled, the sole remaining issue for our decision is the issue raised by the amended petition,[4] the validity of section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs.

In *Pacific First Federal Savings Bank v. Commissioner, supra,* a Court-reviewed decision, we held section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., to be invalid insofar as it requires the application of NOL carrybacks before the computation of bad debt reserves under the percentage of taxable income method provided for by section 593(b)(2)(A). Thereafter, we continued to hold the regulation invalid. *Bell Federal Savings & Loan Association v. Commissioner,* T.C.

---

[4] This Court retains jurisdiction to determine an overpayment for the years at issue, even though the deficiencies asserted in respondent's notice of deficiency have been settled. Sec. 6512(b); *Hannan v. Commissioner,* 52 T.C. 787, 791 (1969).

Memo. 1991–368, revd. 40 F.3d 224 (7th Cir. 1994) (*Bell Federal*); *Leader Federal Savings & Loan Association v. Commissioner,* T.C. Memo. 1991–334 (*Leader Federal*); *Peoples Federal Savings & Loan Association v. Commissioner,* T.C. Memo. 1990–129, revd. 948 F.2d 289 (6th Cir. 1991) (*Peoples Federal*).

The first case to reach an appellate court was *Peoples Federal Savings & Loan Association v. Commissioner, supra,* where the Court of Appeals for the Sixth Circuit reversed the decision of this Court and held the regulation in question valid.

Thereafter, we were again asked to decide the validity of section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs. In another Court-reviewed decision, we adhered to our original holding in *Pacific First* and, because the decision was not appealable to the Court of Appeals for the Sixth Circuit, we again held the regulation invalid.[5] *Georgia Federal Bank v. Commissioner,* 98 T.C. 105 (1992), vacated and remanded (11th Cir., July 12, 1994) (*Georgia Federal*). Respondent appealed our decision to the Court of Appeals for the Eleventh Circuit, but before that court decided the merits of our decision, it was vacated and remanded for entry of a decision in accordance with a settlement reached by the parties.

Shortly after our decision in *Georgia Federal,* the Court of Appeals for the Ninth Circuit reversed our decision in *Pacific First Federal Savings Bank v. Commissioner,* 961 F.2d 800 (9th Cir. 1992), revg. 94 T.C. 101 (1990). More recently, the Court of Appeals for the Seventh Circuit reversed our decision in *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d 224 (7th Cir. 1994), revg. T.C. Memo. 1991–368. In the only other case involving the validity of section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., the District Court for the Eastern District of Washington upheld the regulation. *First Federal Savings Bank of Washington v. United States,* 766 F. Supp. 897 (E.D. Wash. 1991), affd. without published opinion 995 F.2d 947 (9th Cir. 1993).

Petitioner argues that, based on the established principles of stare decisis and the absence of a controlling decision in the Court of Appeals for the Third Circuit, to which an appeal in this case could lie, see *Golsen v. Commissioner,* 54

---

[5] See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we should adhere to our prior position and hold the regulation invalid. Respondent, on the other hand, argues that we should reconsider our position in light of the reversals and uphold the regulation.

*Statutory and Regulatory Background*

Section 593(b) limits the deduction of an addition to petitioner's bad debt reserve to "the applicable percentage of the taxable income" for the year.[6]

From 1956 to 1978, the regulation reflected the interpretation of section 593(b)(2)(A) urged by petitioner whereby, for purposes of that section, taxable income is computed without regard to NOL carrybacks. The first regulation interpreting section 593(b)(2)(A) provided that taxable income was to be computed "without regard to any section providing for a deduction the amount of which is dependent upon the amount of taxable income". Sec. 1.593–1(b)(1), Income Tax Regs., T.D. 6188, 1956–2 C.B. 310, 321. In Rev. Rul. 58–10, 1958–1 C.B. 246, the preceding statement was relied upon to provide that, for purposes of calculating the bad debt reserve addition under the percentage of taxable income method, taxable income was to be determined *before* application of NOL carrybacks. The revenue ruling was incorporated into a modified regulation in 1964. Sec. 1.593–6(b)(2)(iv), Income Tax Regs., T.D. 6728, 1964–1 C.B. 195, 202 (hereinafter the old regulation).

In 1971, respondent issued a proposed regulation whereby bad debt reserves under the percentage of income method would be determined *after* the application of NOL carrybacks, a reversal of the old regulation. Sec. 1.593–6A(b)(5), Proposed

---

[6] SEC. 593(b). ADDITION TO RESERVES FOR BAD DEBTS.—

(1) IN GENERAL.—For purposes of section 166(c), the reasonable addition for the taxable year to the reserve for bad debts * * * shall be an amount equal to the sum of—

\* \* \* \* \* \* \*

(B) the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans, but such amount shall not exceed the amount determined under paragraph (2), (3), or (4) whichever amount is the largest * * *

\* \* \* \* \* \* \*

(2) PERCENTAGE OF TAXABLE INCOME METHOD.—

(A) IN GENERAL.—* * * the amount determined under this paragraph for the taxable year shall be an amount equal to the applicable percentage of the taxable income for such year (determined under the following table):

Income Tax Regs., 36 Fed. Reg. 15050, 15052–15053 (Aug. 12, 1971). In 1978, the substantive change in the proposed regulation was adopted in a final regulation. Sec. 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., T.D. 7549, 1978–1 C.B. 185, 189–190 (hereinafter the new regulation); see also *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 103–105.

*Standard of Review*

Section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., is an interpretive regulation promulgated pursuant to the general authority granted to the Secretary of the Treasury by section 7805(a). *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 106; T.D. 7549, 1978–1 C.B. 185, 191. An interpretive regulation is owed "'less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision'". *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982) (quoting *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981)). The traditional standard of review is to determine whether the interpretive regulation was found to "implement the congressional mandate in some reasonable manner", *United States v. Vogel Fertilizer Co., supra* (quoting *United States v. Correll,* 389 U.S. 299, 307 (1967)); i.e., to determine "whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979) (*National Muffler*). In implementing the traditional standard of review, the courts have recognized that the agency administering the statute has flexibility to change a regulation, in the light of administrative experience. *Rust v. Sullivan,* 500 U.S. 173, 186 (1991); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–864 (1984) (*Chevron*); *National Muffler Dealers Association v. United States,* 440 U.S. at 485; *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d at 229; *Pacific First Federal Savings Bank v. Commissioner,* 961 F.2d at 804; *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d at 303.

The use of the traditional method of review in this case has been subjected to analysis by the three Courts of Appeals

in light of the opinion of the Supreme Court in *Chevron,* which failed to cite *National Muffler* and appeared to establish a different formulation of the standard of review[7] as follows:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

---

[9] The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. * * * If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

[*Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 842–843; some fn. refs. omitted; citations omitted.]

*Chevron* has had a checkered career in the tax arena. Thus, the Court of Appeals for the Ninth Circuit, in deciding *Pacific First Federal Savings Bank v. Commissioner,* 961 F.2d at 803, found it unnecessary to choose between *Chevron* and *National Muffler,* and relied on the *National Muffler* traditional standard of review. In *Bell Federal,* the Court of Appeals for the Seventh Circuit approved the Court of Appeals for the Ninth Circuit's reliance on *National Muffler,* and described the difference between the *Chevron* standard and the *National Muffler* standard as "negligible at best —any regulation which is 'based upon a permissible construction' of an ambiguous statute will almost always 'implement the congressional mandate in some reasonable manner' and vice versa". See *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d at 227. Beyond these

---

[7] In *Peoples Federal Savings & Loan Association v. Commissioner,* 948 F.2d 289, 299–300 (6th Cir. 1991), revg. T.C. Memo. 1990–129, the Court of Appeals for the Sixth Circuit criticized us for ignoring *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), a criticism we sought to meet in our opinion in *Georgia Federal Bank v. Commissioner,* 98 T.C. 105 (1992), vacated and remanded per agreement of the parties (11th Cir., July 12, 1994).

differences, the Supreme Court, as well as other courts, has been inconsistent in applying *Chevron* and *National Muffler,* often ignoring one case and relying on the other.[8] Indeed, there has even been a question as to whether *Chevron* applies to interpretive regulations. See *E.I. duPont de Nemours & Co. v. Commissioner,* 41 F.3d 130 (3d Cir. 1994), affg. 102 T.C. 1 (1994).

Because of our rationale for disposing of the substantive issue before us; i.e., the validity of the regulation, see *infra* p. 394, we find it unnecessary to dissect the differences, if any, between *Chevron* and *National Muffler,* although we are inclined to the view that the impact of the traditional, i.e., *National Muffler* standard, has not been changed by *Chevron,* but has merely been restated in a practical two-part test with possibly subtle distinctions as to the role of legislative history and the degree of deference to be accorded to a regulation. See, e.g., *Sekula v. FDIC,* 39 F.3d 448 (3d Cir. 1994) (combining language); *Armstrong World Industries, Inc. v. Commissioner,* 974 F.2d 422, 430 (3d Cir. 1992), affg. T.C. Memo. 1991–326; *Georgia Federal Bank v. Commissioner,* 98 T.C. at 108–109.

## Substantive Issues

Neither we nor any of the three Courts of Appeals believes that Congress has "spoken directly", either by statute (which is concededly ambiguous) or in legislative history, as to the impact of NOL's on the calculation of the addition to bad debt under the percentage of taxable income method of section 593(b)(2)(A).

In *Pacific First,* we discussed that when amending section 593, Congress implicitly relied on the definition of taxable income compelled, in part, by the old regulation. In amending section 593, Congress sought to allow a deduction under the percentage of taxable income method that would encourage mutual institutions to maintain bad debt reserves, yet ensure that such institutions would be taxed at an appro-

---

[8] Compare *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446–448 (1987) with *INS v. Cardoza-Fonseca,* 480 U.S. at 452–455 (Scalia, J., concurring). See, e.g., *Nationsbank of N.C. v. Variable Annuity Life Ins. Co.,* 513 U.S. ____, 115 S. Ct. 810 (1995) (the Court refers to *Chevron* exclusively); *Cottage Savings Association v. Commissioner,* 499 U.S. 554 (1991) (the Court tested the Commissioner's regulations without reference to *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)); 1 Davis & Pierce, Administrative Law Treatise 123–131 (3d ed. 1972).

priate rate. *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 109 (citing H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 436–437). Ultimately, in the Tax Reform Act of 1969, Pub. L. 91–172, sec. 432, 83 Stat. 487, 620, Congress amended the percentage of taxable income method by reducing the allowable deduction from 60 to 40 percent of taxable income over a 10-year period. The legislative history shows the House and Senate carefully reviewed the effective rate of tax for mutual institutions and the change in the effective rate that the amendment would cause, in striking a compromise. Thus, this Court stated: "the House was cognizant of the effective rate of tax paid by mutual institutions and intended to raise, *but only to a specific and limited extent,* that effective rate by reducing the deduction for addition to bad debt reserve." *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 111. Further, we quoted a Senate report which stated: "The committee believes that the reduction to 50 percent represents a sufficient increase in taxes for these mutual institutions at this time." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 526. *Id.* at 112. Finally, "In order to determine the effect of proposed changes and, if necessary, to modify the changes, Congress must have examined the then-effective regulations and concluded that those regulations correctly reflected Congress' intent as to how NOL carrybacks were to affect deductions for additions to bad debt reserve." *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. at 113. This Court determined, therefore, that the new regulations, because they had the effect of raising the effective rate of tax compared to the effect of the old regulations, were inconsistent with congressional intent and thus invalid. *Id.* at 112.

On appeal, the Court of Appeals for the Sixth Circuit failed to accept that "Congress must have examined" the old regulation. *Peoples Federal Savings & Loan Association v. Commissioner,* 948 F.2d at 301 ("there is no evidence in the legislative history of the statutes in question that Congress ever had a specific or particular intent with respect to the ordering rule to be applied in this case"). Rather, the Court of Appeals, because it did not find a congressional intent in the statute or the legislative history, deferred to respondent under the second step of *Chevron.*

In *Georgia Federal Bank v. Commissioner,* 98 T.C. 105 (1992), vacated and remanded (11th Cir., July 12, 1994), we carefully reviewed the opinion of the Court of Appeals, but decided that our finding of congressional intent in *Pacific First* had been correct.

Soon following our opinion in *Georgia Federal,* the Court of Appeals for the Ninth Circuit reversed our opinion in *Pacific First Federal Savings Bank v. Commissioner,* 94 T.C. 101 (1990), revd. 961 F.2d 800 (1992). The court found "much of the Sixth Circuit's reasoning is persuasive", although it commented that "in the realm of national tax law, 'it is more important that the applicable rule of law be settled than it be settled right.'" *Id.,* 961 F.2d at 803 (citations omitted). Like the Court of Appeals for the Sixth Circuit, the Court of Appeals for the Ninth Circuit found no congressional direction in either the statute or legislative history. Further: "The prior regulations were complex and, as discussed above, resulted in differing levels of taxation depending upon the timing of income and losses." *Id.* at 807. Thus, "Absent clearer evidence that Congress considered the effect of the prior regulations, * * * we cannot usurp the Treasury's congressionally delegated authority to interpret this complex scheme." *Id.*

Likewise, the Court of Appeals for the Seventh Circuit found: "The regulations and statutes involved in this area are too complex for us to venture to assume Congress's intent through its silence", *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d at 230, and reversed *Bell Federal Savings & Loan Association v. Commissioner,* T.C. Memo. 1991–368.

The critical difference between us and the Courts of Appeals turns on whether we were correct in our conclusion that the legislative history contained such a clear expression of legislative intent as to justify the conclusion that the regulation in question was unreasonable. In this connection, we think two criticisms by the Court of Appeals for the Sixth Circuit of our analysis in *Pacific First Federal Savings Bank v. Commissioner, supra,* deserve attention. The first relates to our "review of a lengthy legislative history in the hope of glimpsing congressional intent," which the Court of Appeals suggested was inappropriate under *Chevron. Peoples Federal Savings & Loan Association v. Commissioner,* 948 F.2d 289,

299 (6th Cir. 1991), revg. T.C. Memo. 1990–129. Such criticism does not account for the rule that, according to both *Chevron* and its progeny, a search for congressional intent requires use of "traditional tools of statutory construction," which includes a review of legislative history. *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 648–649 (1990); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 843 n.9. The Courts of Appeals for the Seventh and Ninth Circuits simply held that we had ventured too far in our reliance on legislative history, not that the use of legislative history was incorrect from the beginning. The second criticism was directed at our reliance, in *Pacific First*, on the legislative history of the 1969 Act, which the Court of Appeals for the Sixth Circuit described as a form of the reenactment doctrine and found misplaced because Congress had never expressly mentioned the old regulation. *Peoples Federal Savings & Loan Association v. Commissioner*, 948 F.2d at 302–303; see also *Bell Federal Savings & Loan Association v. Commissioner*, 40 F.3d 224, 230 (7th Cir. 1994), revg. T.C. Memo. 1991–368. In *Georgia Federal Bank v. Commissioner*, 98 T.C. at 119–120, Judge Halpern, in a concurring opinion, explained that our decision in *Pacific First* had not been based on the reenactment doctrine, but on the view that the amendment to section 593 in 1969 and the accompanying legislative history necessarily reflected contemporaneous congressional intent that taxable income be computed for this purpose without taking NOL's into account. See also *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 35 (1982); *Pacific First Federal Savings Bank v. Commissioner*, 94 T.C. at 114 n.5.

We continue to have reservations with respect to the acceptance of the 1978 memorandum of the Acting Assistant Secretary for Tax Policy that the old regulation was "patently wrong", see *Bell Federal Savings & Loan Association v. Commissioner*, 40 F.3d at 229; *Pacific First Federal Savings Bank v. Commissioner*, 961 F.2d at 804; *Peoples Federal Savings & Loan Association v. Commissioner*, 948 F.2d at 303, a position which we rejected in *Georgia Federal Bank v. Commissioner*, 98 T.C. at 117. Where a reversal of a regulation takes place, the Supreme Court has indicated that the later regulation is entitled to less deference than a consistently held agency view. *INS v. Cardoza-Fonseca*, 480 U.S.

421, 446 n.30 (1987); *Georgia Federal Bank v. Commissioner,* 98 T.C. at 109. But see *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d at 229 ("The fact the 26 C.F.R. §1.593–6A(b)[(5)](vi)–(vii) directly contradicts the regulation which it replaces does not necessarily entitle it to less deference in our analysis") (citing *National Muffler Dealers Association v. United States,* 440 U.S. 472 (1979)). This point of view would take on added significance where the earlier regulation has been in effect for over 20 years, as is the case herein.

We have similar reservations with respect to the adoption by the three Courts of Appeals, see *Bell Federal Savings & Loan Association v. Commissioner,* 40 F.3d at 228; *Pacific First Federal Savings Bank v. Commissioner,* 961 F.2d at 806; *Peoples Federal Savings & Loan Association v. Commissioner,* 948 F.2d at 304, of respondent's argument that, because the legislative trend of section 593 was to decrease the benefit of the bad debt reserve deduction, it was a reasonable purpose, by the change in the regulation, to decrease said benefit even further. First, respondent may not add to the restrictions imposed by Congress. See *Iglesias v. United States,* 848 F.2d 362, 366–367 (2d Cir. 1988); *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 527 (1982). Second, because the Courts of Appeals considered the scheme surrounding section 593 too complex to find a reliance by Congress on the old regulation, we find it difficult to understand why the legislative history should support the new regulation, which implemented the same complex statutory scheme.

Despite our reservations, we feel compelled to recognize that the holdings of three Courts of Appeals, that the new regulation is reasonable, make highly suspect our contrary position based on the implied, as contrasted with the express, intent of Congress. Such being the case, we are persuaded that, in this area, we should no longer rely on implied intent to deprive respondent of her ability to sustain the new regulation as reasonable because it reflects a choice between permissible statutory interpretations. Cf. *Perkin-Elmer Corp. v. Commissioner,* 103 T.C. 464 (1994). We emphasize, however, that the legislative history of a statutory provision may be so clear that a finding of implied intent on the part of Congress would be in order in a future case involving statu-

tory interpretation. Similarly, divergence in views between this Court and one or more Courts of Appeals may have a different impact, depending on the circumstances. In sum, we conclude that we should accede to the decision of the three Courts of Appeals and should no longer adhere to the view that the new regulation is invalid. Cf. *Fazi v. Commissioner,* 102 T.C. 695, 713–714 (1994); *Kueneman v. Commissioner,* 68 T.C. 609, 620 (1977) (Tannenwald, J., concurring), affd. 628 F.2d 1196 (9th Cir. 1980).

### Retroactive Application

In 1979, the new regulation was amended so that NOL's occurring after December 31, 1978, would be included in the computation of taxable income for taxable years beginning before January 1, 1978. T.D. 7626, 1979–2 C.B. 239. Petitioner argues that this is a retroactive application which exceeds the permissible period of retroactivity normally approved by the courts. Furthermore, petitioner argues, giving the new regulation retroactive effect 1 year after stating the regulation would have only prospective effect was an abuse of discretion.

Petitioner, however, ignores the fact that we have previously held the revision of the effective date of section 1.593–6A(b)(5)(vi) and (vii), Income Tax Regs., was a permissible exercise of the discretion conferred on respondent by section 7805(b). *Pacific First Federal Savings Bank v. Commissioner,* 101 T.C. 117 (1993). For the reasons enunciated therein, we decline to hold that the 1979 amendment was improper or an abuse of discretion.

Petitioner's motion for summary judgment will be denied, and respondent's cross-motion for summary judgment will be granted.

*An appropriate order will be issued and decision will be entered under Rule 155.*

Reviewed by the Court.

HAMBLEN, CHABOT, COHEN, WHALEN, COLVIN, BEGHE, and CHIECHI, *JJ.,* agree with this majority opinion.

---

GERBER *J.,* concurring: Although I concur in the majority's result, for the reasons expressed in my dissenting opinions in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101, 117 (1990), and *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105, 121 (1992), I continue to regard the questioned regulation as valid.

PARKER, JACOBS, WRIGHT, PARR, and RUWE, *JJ.,* agree with this concurring opinion.

---

BEGHE, *J.,* concurring: The writer joined this Court in time to join the majority and concurring opinions in *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105, 119 (1992) (Court reviewed), vacated and remanded by agreement of the parties (11th Cir., July 12, 1994). More recently, however, the writer chided his colleagues for continuing to swim against the tide, *Estate of Hubert v. Commissioner,* 101 T.C. 314, 351 (1993) (Beghe, J., concurring in part and dissenting in part), and for invalidating a legislative regulation that four other Judges of this Court found not "'arbitrary, capricious or manifestly contrary to the statute'", *Tate & Lyle, Inc. & Subs. v. Commissioner,* 103 T.C. 656, 697–698 (1994) (Beghe, J., dissenting) (citations omitted). If the writer hadn't gone along with the majority in the case at hand, he might well accuse himself, in the face of the reversals by the Courts of Appeals for the Sixth, Seventh, and Ninth Circuits (and the agreement by the taxpayer in *Georgia Fed. Bank v. Commissioner, supra,* to the full deficiency determined by the Commissioner), of both inconsistency and lese majesty.

The writer continues to be concerned by the actions of the Treasury in changing its policy on the interaction of savings bank NOL carrybacks and bad debt reserves. He is particularly disturbed by the contrast between the cursory justifications advanced for public consumption in the preambles to the notice of proposed rule making, 36 Fed. Reg. 15050 (Aug. 12, 1971), and the final regulation, 43 Fed. Reg. 21454 (May

18, 1978), and the in camera memoranda for senior Treasury officials referred to in *Georgia Fed. Bank v. Commissioner,* 98 T.C. at 111 n.2 (1978 memo) and 112 n.3 (1971 memo)—primarily the 1978 memo, which was relied upon by the Court of Appeals for the Sixth Circuit in *Peoples Fed. Sav. & Loan Association of Sidney v. Commissioner,* 948 F.2d 289, 303 (6th Cir. 1991), revg. and remanding T.C. Memo. 1990–129.

The Court of Appeals for the Tenth Circuit has recently reminded this Court that departments and agencies of the executive branch, including the Internal Revenue Service, should, under general principles of administrative law, contemporaneously declare the reasons for their decisions. *Fisher v. Commissioner,* 45 F.3d 396, 397 (10th Cir. 1995) (citing *Harberson v. NLRB,* 810 F.2d 977, 984 (10th Cir. 1987) and *SEC v. Chenery Corp.,* 318 U.S. 80, 94 (1943)), revg. and remanding T.C. Memo. 1992–740. However, the writer is now more mindful of the Supreme Court's admonition to the judicial branch to defer to decisions of the executive branch, particularly when they are politically motivated, and even when they change policy. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–866 (1984). The writer therefore concludes that the Treasury's belated in camera rationalizations in support of the final regulation were sufficient to render the regulation "reasonable" under the standards being applied by higher courts.

---

WELLS *J.,* dissenting: Although I agree with much of what the majority opinion has to offer in the way of criticisms of the decisions of the Courts of Appeals in *Peoples Fed. Sav. & Loan Association v. Commissioner,* 948 F.2d 289 (6th Cir. 1991), revg. T.C. Memo. 1990–129; *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d 800, 805 (9th Cir. 1992), revg. 94 T.C. 101 (1990); and *Bell Fed. Sav. & Loan Association v. Commissioner,* 40 F.3d 224 (7th Cir. 1994), revg. and remanding T.C. Memo. 1991–368, I cannot join those of my colleagues who conclude that this Court should "accede" to such decisions. As the majority points out, the reasoning of

the Courts of Appeals is not persuasive.[1] Moreover, at stake in these cases is a principle which warrants more than this Court's conclusion to merely accede to the decisions of those courts.

The principle at stake is whether the Treasury, under the guise of interpreting a statute, may reverse a longstanding, reasonable provision of its regulations, where the reversal upsets a carefully crafted legislative compromise setting the effective level of taxation of an industry.[2] I respectfully suggest that, by using an inquiry of limited scope to decide whether the regulation in issue is reasonable and by failing to consider the context in which the Treasury's reversal of that regulation occurred, the opinions of the Courts of Appeals obscure the significance of that reversal and its impact on the congressional plan for the taxation of the industry. I respectfully disagree with the apparent view of the Courts of Appeals that it was inappropriate for this Court to engage in a "plenary review of the statute and legislative history to determine the appropriate meaning of the Code" in order to determine the reasonableness of the regulation in issue. See, e.g., *Pacific First Fed. Sav. Bank v. Commissioner, supra.* I remain convinced that such an inquiry is appropriate in order to afford taxpayers meaningful review of a challenged regulation. While the approach adopted by the Courts of Appeals may ease disposition of difficult cases, it does not always produce just results.

As pointed out in our Court-reviewed opinion in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. at 110–114, and subsequently in Judge Halpern's concurring opinion in *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105, 119–121 (1992), Congress reached a compromise in setting a level of taxation that it believed appropriate for the mutual savings bank industry, and must have based the deduction limitations imposed in 1969 upon a definition of taxable income that reflected the first ordering rule promulgated by the Treasury in section 1.593–6(b)(2)(iv), Income Tax Regs., T.D.

---

[1] It appears that the majority is subscribing to the proposition it quotes from *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d 800, 805 (9th Cir. 1992), revg. 94 T.C. 101 (1990), that "in the realm of national tax law, 'it is more important that the applicable rule of law be settled than it be settled right.'" Majority op. p. 394.

[2] This principle was discussed at length in *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105 (1992) (Court reviewed), vacated and remanded by agreement of the parties (11th Cir., July 12, 1994).

6728, 1964–1 C.B. 195, 202 (the old regulation). Whether or not Congress explicitly said that it was relying on the definition in the old regulation, such reliance is apparent from the process leading up to the adoption of the 1969 modifications to section 593 and Congress' desire to raise the effective rate of tax imposed on mutual savings banks by only a certain amount.

The old regulation reasonably interprets the statute, and no court has held to the contrary. Only the 1978 memorandum of the Assistant Secretary for Tax Policy discussing the reasons for the change in the old regulation suggests that the old regulation was incorrect. The 1978 memorandum, however, is a self-serving statement and lacks credibility given the Treasury's history of attacking the percentage method and its hostility to this congressionally sanctioned tax break for the mutual savings bank industry. See *Georgia Fed. Bank v. Commissioner, supra* at 115–116. Rather than correcting an error in the old regulation, the modification adopted in 1978 (the new regulation) in effect achieves "what Congress has repeatedly denied the Treasury: a form of repeal of the percentage method." *Id.* at 116. The majority therefore correctly expresses reservations about whether the 1978 memorandum should be accepted as persuasive reasoning for reversing the old regulation. Majority op. p. 396.

Given that the new regulation did not correct an error in the old regulation,[3] I do not think it is sufficient to simply consider whether the new regulation is also reasonable,[4] especially where, as in the instant case, the old regulation put in place the framework for the interplay of the two sections of the Internal Revenue Code that Congress specifically amended in order to achieve the legislative compromise it reached in 1969.

Given this background, I respectfully suggest that, in order to ensure that the intent of Congress is effectuated, it is incumbent upon the courts to carefully scrutinize the reasons offered by the Treasury for reversing the method by which the deduction for the addition to bad debt reserve is cal-

---

[3] I do not suggest that the Treasury should not be permitted to correct an error where its first interpretation is wrong. The instant case, however, does not present such a circumstance.

[4] I remain committed to the proposition that the new regulation is not a reasonable interpretation of Congress' intent for the reasons set forth in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101 (1990), revd. 961 F.2d 800 (9th Cir. 1992).

culated. See *Motor Vehicle Manufacturers Association v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 48 (1983); *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C. Cir. 1988). I note that the Court of Appeals for the Third Circuit, to which this case is appealable absent stipulation to the contrary, has stated that "Sharp changes of agency course constitute 'danger signals' to which a reviewing court must be alert." *West v. Bowen,* 879 F.2d 1122, 1127 (3d Cir. 1989).

Inquiring into the basis for an agency's action neither requires the courts to usurp the function of the Treasury to make choices among reasonable alternatives in interpreting statutes, nor contravenes the teachings of *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–864 (1984), which opinion gives an agency great leeway to change its regulations in light of experience or changed circumstances.[5] The examination this Court undertook in *Pacific First* and *Georgia Federal* was necessary in order to ascertain whether the Treasury confined itself to interpreting the statutory scheme created by Congress, which is its proper role, or whether the Treasury intentionally took it upon itself to revise or add to the congressional enactment. A regulation that is not technically inconsistent with the statutory language cannot stand if it is fundamentally at odds with the manifest congressional design. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26 (1982). Interpreting legislative intent requires more than a cursory reading of the legislative history to see whether Congress specifically mentioned the regulation in question.

I agree with the majority's suggestion that even the standards traditionally applied to review regulations support our approach in *Pacific First* and *Georgia Federal* (majority op. pp. 394–395), and that a reversal of an interpretation may be entitled to less deference than would otherwise be the case. (Majority op. pp. 395–396.) Under the principles of *National Muffler Dealers Association v. United States,* 440 U.S. 472,

---

[5] I do not suggest that an agency should not be permitted to change course in light of administrative experience or changed circumstances. Contrary to the Seventh Circuit Court of Appeal's suggestion in *Bell Fed. Sav. & Loan Association v. Commissioner,* 40 F.3d 224 (7th Cir. 1994), revg. and remanding T.C. Memo. 1991–368, I find no such experience or circumstances warranting a reversal of the old regulation. The only experience suggested by the Court of Appeals is the self-serving 1978 memorandum of the Assistant Secretary of the Treasury for Tax Policy which states that the old regulation is "patently wrong," a conclusion that neither the Court of Appeals nor any other court has reached.

477 (1979), where a regulation is not a substantially contemporaneous interpretation of a statute, but dates from a later period or repudiates an earlier interpretation, the manner in which that regulation evolved merits inquiry, as does the length of time the regulation has been in effect, the consistency of the agency's interpretation, and the degree of scrutiny devoted to the interpretation by Congress. These factors we considered in our majority opinions in *Pacific First* and *Georgia Federal.*

Even the Court of Appeals that reversed this Court in *Peoples Fed. Sav. & Loan Association v. Commissioner,* 948 F.2d 289 (6th Cir. 1991), revg. T.C. Memo. 1990–129 (granting a wide latitude of deference to the Treasury under the principles of *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837 (1984), and *Rust v. Sullivan,* 500 U.S. 173 (1991)), has recently expressed frustration with the standard to be used in testing agency interpretations of a statute. In *Wolpaw v. Commissioner,* 47 F.3d 787 (6th Cir. 1995), revg. and remanding T.C. Memo. 1993–322, the Sixth Circuit Court of Appeals began its inquiry into the Treasury's interpretation of section 117 with the following statement:

> The degree of deference to be accorded an agency's interpretation of a statute Congress has charged it with administering varies, depending on several factors, including the existence of a statute mandating a standard of review, the form and formality of the interpretation, and the consistency of the agency's interpretation over time. * * *

Concerning the difficulty courts have in applying the various pronouncements of the Supreme Court, the court commented as follows: "'the degree to which courts are bound by agency interpretations of law has been like quicksand. The standard seems to have been constantly shifting, steadily sinking, and, from the perspective of the intermediate appellate courts, frustrating.'" *Id.* In the instant case, the majority correctly points out that "*Chevron* has had a checkered career in the tax arena." Majority op. p. 391.

I believe that the traditional standard of review, utilizing the factors set forth in *National Muffler,* does not limit courts to merely considering whether Congress expressly approved the old regulation in deciding whether to sustain the new regulation. Rather, courts should conduct the type of inquiry that this Court performed in *Pacific First* and *Georgia Fed-*

*eral.*[6] Otherwise, judicial review would be rendered an ineffective check on the Treasury's ability to uproot settled law where it finds itself in disagreement with Congress on the tax benefits Congress has decided to confer on certain industries.

Like the majority, majority op. pp. 395–396, I do not find persuasive the statements of the Courts of Appeals that the new regulation is a permissible interpretation of the statute because it followed a legislative trend of reducing the allowable deduction for the addition to bad debt reserve. Although Congress reduced the allowable deduction for the addition to bad debt reserve over time, it did so in a measured way, through the give and take of the legislative process. Congress did not delegate this function to the Department of the Treasury.

The legislative trend identified by the Courts of Appeals should not be considered an open invitation by Congress to the Treasury to further pare back the allowable deduction through revisions to the manner in which it is to be calculated. As this Court described in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. at 108–114, Congress decided, in successive enactments, upon the level of tax that was to be exacted from the mutual savings bank industry. Congress decided the manner in which the deduction for the addition to bad debt reserve was to be modified, and the Treasury should not be allowed to upset the legislative compromise by further limiting the deduction by means of reversing its longstanding reasonable regulations for the addition to bad debt reserve. Once the Treasury settled on a reasonable interpretation of the statute in 1964, it then became obligated to provide persuasive reasons for upsetting settled law, particularly in light of the intervening legislative compromise.

I respectfully submit that consideration of the legislative history and of the facts and circumstances surrounding the adoption of the new regulation leads to the conclusion that the Treasury acted in an arbitrary manner in adopting the new regulation, which upset a carefully crafted compromise. In light of the Treasury's failure to provide a persuasive

---

[6] No Court of Appeals has specifically criticized or addressed this Court's analysis in *Georgia Federal.*

rationale for reversal of the position embodied in the new regulation, I would hold, as this Court already has done in two Court-reviewed opinions, that the regulation is invalid.

SWIFT and LARO, *JJ.,* agree with this dissent.

---

HALPERN, *J.,* dissenting: I dissent because I am not persuaded that, in the words of the majority, "we should accede to the decision of the three Courts of Appeals and should no longer adhere to the view that the new regulation is invalid." Majority op. p. 397.

The majority sets the stage for acceding in the following terms:

> The critical difference between us and the Courts of Appeals turns on whether we were correct in our conclusion that the legislative history contained such a clear expression of legislative intent as to justify the conclusion that the regulation in question was unreasonable. * * * [Majority op. p. 394.]

The majority then proceeds (1) to reject two criticisms made by the Court of Appeals for the Sixth Circuit of our approach in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101 (1990), revd. 961 F.2d 800 (9th Cir. 1992), and (2) to express reservations about certain positive arguments made by the Courts of Appeals. Indeed, the majority fails expressly to set forth any positive argument made by any of the Courts of Appeals with which it agrees. The sum and substance of the majority's reasoning is as follows:

> Despite our reservations, we feel compelled to recognize that the holdings of three Courts of Appeals, that the new regulation is reasonable, make highly suspect our contrary position based on the implied, as contrasted with the express, intent of Congress. * * * [Majority op. p. 396.]

To be sure, the majority makes clear that it is not adopting a rule of statutory construction that disregards implied intent in all cases: "We emphasize, however, that the legislative history of a statutory provision may be so clear that a finding of implied intent on the part of Congress would be in order in a future case involving statutory interpretation." Majority op. pp. 396–397. Apparently, the majority is suggesting only that implied intent is less relevant to determining the reasonableness of a regulation than it is to a

question of straight statutory interpretation. That is a distinction with which I cannot agree.

We are a Court of national jurisdiction with expertise in the area of Federal taxes. Since appeals from this Court lie to each of the 12 Courts of Appeals, we face unique problems in dealing with the opinions of Circuit Courts. See, e.g., *Lawrence v. Commissioner,* 27 T.C. 713 (1957), revd. 258 F.2d 562 (9th Cir. 1958); *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971); *Lardas v. Commissioner,* 99 T.C. 490 (1992). We have, since *Lawrence,* backed off from the position taken therein, that, while certainly we should seriously consider the reasoning of a Court of Appeals that had reversed one of our decisions, we ought not to follow the Court of Appeals' decision if we believe it to be incorrect:

if still of the opinion that its original result was right, a court of national jurisdiction to avoid confusion should follow its own honest beliefs until the Supreme Court decides the point. The Tax Court early concluded that it should decide all cases as it thought right. [*Lawrence v. Commissioner, supra* at 716–717; fn. refs. omitted.]

We have backed off to the extent that, in *Golsen v. Commissioner, supra,* we created a narrow exception to the *Lawrence* doctrine. Where a reversal would appear inevitable, due to the clearly established position of the Court of Appeals to which an appeal would lie, our obligation as a national Court does not require a futile and wasteful insistence on our view. *Golsen v. Commissioner,* 54 T.C. 742, 757. Accordingly, in that narrow circumstance, although we still think the result wrong, we will follow that Court of Appeals. Compare *Golsen v. Commissioner, supra* (*Golsen* doctrine established) with *Lardas v. Commissioner, supra* (*Golsen* doctrine inapplicable). This is *not* a case governed by the *Golsen* doctrine.

In *Lawrence v. Commissioner, supra* at 717, we also stated:

The Tax Court and its individual Judges have always had respect for the * * * [12] Courts of Appeals, have had no desire to ignore or lightly regard any decisions of those courts and have carefully considered all suggestions of those courts. The Tax Court not infrequently has been persuaded by the reasoning of opinions of those courts to change its views on various questions being litigated. [Citations omitted.]

I am unconvinced that the majority is persuaded by the reasoning of the Courts of Appeals for the Sixth, Seventh,

and Ninth Circuits. Indeed, the majority seems to cite with approval my necessarily contrary analysis in *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105 (1992), vacated and remanded per agreement of the parties (11th Cir., July 12, 1994):

> In *Georgia Federal Bank v. Commissioner,* 98 T.C. at 119–120, Judge Halpern, in a concurring opinion, explained that our decision in *Pacific First* had not been based on the reenactment doctrine, but on the view that the amendment to section 593 in 1969 and the accompanying legislative history *necessarily reflected contemporaneous congressional intent that taxable income be computed for this purpose without taking NOL's into account.* \* \* \* [Majority op. p. 395; emphasis added.]

The majority has failed to convince me that we should not abide by our previous holdings. Besides the fact that three Courts of Appeals disagree with it, what precisely is wrong with our conclusion that the implicit intent of Congress makes unreasonable the new regulation? The majority quotes a comment made by the Court of Appeals for the Ninth Circuit: "'in the realm of national tax law, "it is more important that the applicable rule of law be settled than it be settled right."'" Majority op. p. 394. Although I do not necessarily reject that approach in all cases, I am unpersuaded that it is an appropriate approach here. I believe that, as a general rule, we should practice what we preached in *Lawrence v. Commissioner, supra.* We should follow our own honest beliefs until the Supreme Court decides the point. *Id.* at 716–717. To quote: "The Tax Court early concluded that it should decide all cases as it thought right." *Id.* at 717. What we thought right is set forth in *Georgia Fed. Bank v. Commissioner, supra,* and *Pacific First Fed. Sav. Bank v. Commissioner, supra.* We should follow those decisions.

WELLS, *J.,* agrees with this dissent.